[No. S004790. Crim. No. 26424. June 30, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH TYRONE FUDGE, Defendant and Appellant.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, and Monica Knox, Deputy State Public Defender, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan Lee Frierson, Linda C. Johnson and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LUCAS, C. J.**—Keith Tyrone Fudge was charged in an amended information in Los Angeles County with five counts of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise stated), five counts of attempted murder (§§ 664/187), various enhancement allegations, and a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)). The charges stemmed from the October 12, 1984, shooting that resulted in the deaths of Darryl Coleman, Diane Rasberry, Percy Brewer, Shannon Cannon, and Phillip Westbrook, and the wounding of five additional persons. After 56 hours of deliberations, the jury was deadlocked in the first trial and the trial court declared a mistrial.

On retrial, the People dismissed the attempted murder charges. The jury convicted defendant of five counts of first degree murder, and also found true five enhancement allegations that defendant personally used a firearm in the commission of the murders (§ 12022.5). In addition, the jury sustained the multiple-murder special-circumstance allegation. At the conclusion of the penalty phase of the trial, the jury determined the defendant should suffer the death penalty. This appeal is automatic. (§ 1239, subd. (b).) We affirm the guilt and penalty judgments in their entirety.

### FACTS

The brutal crimes that underlie this case find their genesis in the long-standing feud between two major street gangs in Los Angeles, the Bloods and the Crips. Members of these gangs consider themselves mortal enemies and will go to great lengths to avenge acts of disrespect, both real and perceived, toward their respective gangs.

Both gangs have several subgroupings or sects. Two sects of the Crips are the Five Deuce Hoover Crips and the Broadway Crips. The Van Ness Gangsters are a sect of the Bloods. Defendant, whose street name is Ase Kapone,[1] was one of the leaders of the Van Ness Gangsters. At least two of the five murder victims, and several of the witnesses, were members of the Crips.

---

[1]We presume this is a derivation of "Ace Capone," a bit of wordplay meaning "Number One Gangster."

*Guilt Phase*

On October 12, 1984, Leon Chislom was at a high school football game with Alexander Sanders and Tracy Harris. Both Sanders and Harris were members of the Five Deuce Hoover Crips. The three left the game in Chislom's car and drove down 54th Street toward Western Avenue. As they drove past a gray Chevrolet, the occupants of the Chevrolet held up their little finger, index finger, and thumb. Chislom, Sanders, and Harris recognized this gesture as indicating the Bloods gang. They made a U-turn to return to the gray Chevrolet. As they passed the Chevrolet again, Chislom recognized defendant and exclaimed, "There go Ase." Chislom, Sanders, and Harris were aware that defendant was a member of the Van Ness Gangsters.

It appeared that someone in defendant's car was reaching under the dashboard for something. Chislom retrieved a firearm from his glove compartment and gave it to Harris. As they approached the gray Chevrolet again, Harris jumped out with the gun, causing defendant and his two companions to flee on foot. Harris then stole the gray Chevrolet and drove it into an alley, followed by Chislom in his car. Darryl Herbert, another member of the Five Deuce Hoover Crips, was walking down the street when he saw Harris drive into the alley. Chislom told Herbert they had just stolen the car from Ase Kapone of the Van Ness Gangsters. They proceeded to remove the speakers from the car and Herbert wrote "52 VNG Killer"[2] on the trunk of the car. Herbert later said he wanted defendant to know the Five Deuce Hoover Crips had taken his car. Sanders then drove the car away, but soon abandoned it when it overheated.

Defendant went to speak with Virgil Allen, who lived in Crips territory but was not himself associated with the Crips. Defendant told Allen that Allen's "homeboys" had stolen his car, meaning the Crips had taken it. Defendant told Allen he wanted the car back, and Allen promised to try to secure its return. Later that afternoon, Martin Ware overheard defendant tell "Fat Freddie" that he (defendant) was upset about his car being stolen, and that he wanted to get it back. "Fat Freddie" was the street name for Fred Knight.

That night, Traci Berry and her friend Latasha were having a party at Berry's house. To help cover the cost of the food, drink, and the disc jockey, the women decided to charge a $1 entrance fee. Although Berry's house was in the middle of the territory claimed by the Five Deuce Hoover Crips, Berry decided not to admit any "gangbangers" (i.e., gang members). Nevertheless,

---

[2]This inscription was an apparent boast that the Five Deuce (or "52") Hoover Crips had taken advantage of the Van Ness Gangsters (or "VNG").

many members of the Crips showed up and those known to Berry were turned away. Those refused entrance, as well as others, congregated on the sidewalk area outside the fence that ran the width of Berry's property. Cars were parked up and down the street.

From the vantage point on her porch, Traci Berry estimated there were 10 to 20 people in the area in front of her house outside the fence. Juanita Walton, who came to the party with Darryl Coleman, estimated there were 70 to 80 people in front of the house. Diane Rasberry, a guest, was in the front yard talking to some people on the sidewalk. Phillip Westbrook rode up on his bicycle to see how the party was progressing. Another guest, 13-year-old Shannon Cannon, was on the sidewalk as well. Karl Smith, a member of the Five Deuce Hoover Crips, was also on the sidewalk talking with fellow Crips members Coleman and Percy Brewer. Sometime between 9 and 9:30 p.m., Smith noticed Fred Knight enter the front yard, walk around, and then leave.

Around 9:30 p.m., one or two cars arrived and double-parked in front of Berry's house. Two young men emerged, one carrying a rifle, one a shotgun, and approached the front yard. The man with the rifle, later identified as defendant, wore his hair in "jheri-curls." Someone called out Percy Brewer's street name ("Buddha") and Brewer replied "Ah, Cuzz." A hail of bullets and shotgun pellets then began to rain down on the party-goers.

Bridgette Hollomon was talking with Brewer and Rasberry when the shooting started. All three fell to the ground. Hollomon looked up at defendant and screamed, "Please don't shoot, don't shoot, why are you shooting?" When defendant kept shooting, she put her head down and cried.

Karl Smith was talking to a party guest when he saw two cars stop in front of the house. He recognized Fred Knight as the man with the shotgun and defendant as the man with the rifle and the jheri-curls. Smith ducked and ran down the street when the shooting started.

Clarence Watson was also a member of the Five Deuce Hoover Crips. He was standing outside the fence at Traci Berry's party when he saw the two cars stop. He recognized defendant as a member of the Van Ness Gangsters. Watson ran across the street when the two men began firing.

When the shooting began, Traci Berry ducked and covered her head. When the shooting stopped, she saw the man with the rifle jump back into a car and drive off. Tracy Harris (who had participated in the theft of defendant's car earlier that day) was at the party and ran after the cars, shooting at them with a handgun. Berry ran inside the house and called 911.

The shooting left Darryl Coleman, Phillip Westbrook, Shannon Cannon, and Percy Brewer dead. Diane Rasberry was rushed to a hospital where she was pronounced dead on arrival. Five other victims suffered wounds.

A few days after the shooting, Sidney Garrett was at the corner of 54th Street and Arlington where he overheard defendant tell Dwayne Reed that "I got them Hoovers" and had "sprayed 'em real good VNG style." Garrett was a member of the Black Peacestone Bloods, who enjoy a peaceful relationship with the Van Ness Gangsters. Garrett informed police of these statements when he was interviewed in December 1984. At trial, he testified he could not remember these statements and police officers testified to the statements.

Five or six days after the shooting, defendant spoke to Angela Miller, whom he had known only a brief time. He appeared nervous and, when Miller asked him if anything was wrong, he said he had killed some members of the Five Deuce Hoover Crips and was afraid of both them and the police as a result.

On November 10, 1984, defendant was arrested with Fred Knight at a rock house[3] less than two miles from the scene of the crime. The house apparently belonged to a middle-aged man named Perkins, although a police search revealed a receipt from a cleaners with defendant's name on it. A box of shotgun shells was found in a closet.

From April to June 1985, defendant was confined in C-Row in module 3100 of the Men's Central Jail in Los Angeles. The walkway outside the row of cells was known as the "freeway" and inmates were given "freeway time" for 30 minutes a day. During freeway time, an inmate could stroll up and down the walkway, conversing with other inmates. Only one inmate at a time was given freeway time.

Austin Willis was also on C-Row at this time, and he and defendant had conversations during this period of mutual confinement. Defendant was interested in possibly becoming an informant, and asked Willis about that possibility. Upon learning defendant was charged with murder, Willis asked if defendant was the shooter. Defendant then confessed to Willis. He said Percy Brewer ("Buddha") pulled a gun on him and stole his car. Defendant said he escaped back to his neighborhood where he and his homeboys decided to retaliate. According to Willis, defendant bought a car for $50 and

---

[3]A rock house is a "specially fortified residential dwelling[] where crystallized 'rock' cocaine is made and sold." (*Langford* v. *Superior Court* (1987) 43 Cal.3d 21, 24 [233 Cal.Rptr. 387, 729 P.2d 822]; see also, *id.* at p. 25 [discussing the typical fortifications at a rock house].)

then he, Fred Knight, and Tyrone Lewis left the rock house to drive to where they knew a party was in progress. Defendant stayed in the car while Knight went to the party looking for Brewer. Upon reporting back that Brewer was present, defendant drove to the party where he "sprayed down the fools just like that" with an automatic rifle. Knight allegedly fired at the crowd with a shotgun.[4]

David Gerhardt was also incarcerated on C-Row during May and June 1985. He testified that defendant told him that he, Knight, and Harold Hall fired into the crowd at Traci Berry's party because the person responsible for stealing defendant's car was a party guest. In addition, defendant asked Gerhardt if he knew Willis. When Gerhardt replied in the affirmative, defendant said Willis was repeating things defendant had told him, gave Gerhardt $20, and asked him to tell Willis to stay out of his business or something would come to him "in a kickdown."

Later, according to Gerhardt, defendant told him Willis was definitely trying to testify against him and that defendant wanted Gerhardt's help in learning the names and addresses of Willis's relatives. Defendant later promised Gerhardt a large sum of money if he could acquire this information. Defendant asked Gerhardt to convey a threat to Willis that defendant's homeboys would kill Willis.

On June 26, 1985, jail authorities discovered defendant's cell was covered in graffiti. Detective Joseph, a police expert on gang jargon, interpreted the graffiti and testified that it said defendant was the leader of the Van Ness Gangsters, that he was a murderer of Cripses, and that he was responsible for the deaths of Crips members on 54th Street, an apparent reference to the October 12, 1984, shooting at Traci Berry's house.

Mark Brown testified that on June 22, 1987, he was in a holding cell with defendant and Willis. Defendant indicated that Willis was testifying against him and, drawing his index finger across his throat, indicated to Brown that Willis should be killed. Later, defendant, indicating Willis, told Brown to "peel his cap," which Brown said meant to "hit someone, to take their head off," or to kill them.

*The Defense Case*

Lottie Martin testified she was Tony Welch's grandmother. When she returned home from work on October 12, 1984, Welch and defendant were

---

[4]Fred Knight ("Fat Freddie") was tried separately and acquitted of all charges. To rebut Willis's testimony, defendant presented evidence that Tyrone Lewis ("T-Bone" or "D-Bone") had been arrested on other charges and was in police custody on the night of the shooting.

in her home. Both Welch and defendant spent the night, were in the house when Martin went to sleep at 8:50 or 9 p.m., were present when she got a glass of water in the middle of the night, and were in the house when she woke at 4 a.m. the next morning. Her doors require a key for both ingress and egress, and Welch did not have a key. She did not hear anyone enter or leave the house that night although her doors are made of metal and easily audible when opened.

Both Gregory Evans and his brother, Anthony Evans, were members of the Five Deuce Hoover Crips. Both were standing across the street from Traci Berry's house the night of the party and both saw the gunmen arrive. Although the brothers agreed one of the men wore his hair in jheri-curl fashion, both testified that the gunman was not defendant.[5] On rebuttal, the People presented evidence that Anthony Evans was in custody on the night of the shooting.

Eddie Land testified he was in the holding cell with defendant and Mark Brown on June 22, 1987. Land stated he witnessed no threat, and further testified that defendant's handcuffs and waist-chain would have made it impossible to make any gestures.

Raphael Calix testified that while in county jail, David Gerhardt asked him for information about defendant's crime. In addition, Austin Willis had asked him to testify that he had overheard defendant confess the crime to Willis.

Kathy Pezdek, a cognitive psychologist, is an expert on eyewitness identification and testified for the defense. She explained the various difficulties with accurate perception under stress and memory retrieval over time. In her opinion, the factors of duration of exposure, lighting, distractions, weapon focus, delay, familiarity, unconscious transference, and suggestibility were all relevant to this case.

*Penalty Phase*

For the penalty phase of the trial, the People introduced no new aggravating evidence; instead, they relied on the evidence of guilt presented at the guilt phase.

Defendant presented evidence in mitigation. Peggy Fudge, defendant's mother, testified that she never married defendant's father, that defendant's

---

[5]Anthony Evans noted the gunman wore blue clothing. Blue is a Crips color. Red is the Bloods color. Testimony established that Crips members hate the color red so much that some do not stop for red lights. Some Bloods members will not use words with the letter "C" in them. The implication was that it was unlikely the killer was a member of the Bloods.

father stayed in Louisiana when she moved to Los Angeles, and that defendant never knew him. When defendant was two years old, Mrs. Fudge married George Goldston. Goldston was the only father defendant ever knew and the two were very close. When Mrs. Fudge and Goldston divorced four years later, Goldston continued his relationship with defendant for about a year but then stopped visiting.

Shortly thereafter, defendant went to Marshall, Texas, to live with his grandmother, Florence Fudge. He had a close relationship with her, and while in Texas was a member of the Boy Scouts, received good grades in school, played sports, went to church, and sang in the choir.

Defendant returned to Los Angeles in 1975. He attended four different high schools. Shortly before his 18th birthday, his mother's home was in foreclosure and defendant was upset at the prospect of losing the house. Around this time, defendant also rebelled against his mother's rules and wanted her to treat him as an adult instead of a child, saying, "Mom, I can handle myself." She told him he would have the chance to prove it, and that if he was not home when she got home from work, he should find his own place to live. He was not at home that evening, and she saw him only once thereafter before he was arrested for the present crimes.

Peggy Fudge said that defendant believed in God and prayed every night. Both Peggy and Florence Fudge said they would visit defendant in prison, and both asked the jury to spare defendant's life.

DISCUSSION

*Jury Issues*

1. *Witt*

After extensive voir dire, the prosecutor successfully challenged prospective juror Williams for cause. Defendant argues that in granting the challenge, the trial court erred under the principles set forth in various federal and state precedents governing the use of for-cause challenges in capital cases. (*Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] [hereafter *Witt*]; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 129-130 [5 Cal.Rptr.2d 796, 825 P.2d 781] [applying *Witt*]; *People* v. *Fields* (1983) 35 Cal.3d 329, 353-358 [197 Cal.Rptr. 803, 673 P.2d 680] [hereafter *Fields*].) *Witt* requires a trial court to determine "whether the juror's views would prevent or substantially impair the performance of his duties as

a juror in accordance with his instructions and his oath.' " (*Witt, supra,* at p. 424 [83 L.Ed.2d at pp. 851-852].) "Under *Witt,* therefore, our duty is to 'examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of [the juror's] duties . . ." was fairly supported by the record.' " (*People* v. *Miranda* (1987) 44 Cal.3d 57, 94 [241 Cal.Rptr. 594, 744 P.2d 1127], quoting *Darden* v. *Wainwright* (1986) 477 U.S. 168, 176 [91 L.Ed.2d 144, 154, 106 S.Ct. 2464].)

In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts. (*People* v. *Hardy, supra,* 2 Cal.4th at p. 130 [hereafter. *Hardy*]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].)

■ Prospective juror Williams stated on voir dire that she believed in the death penalty in general but would not impose it in this case due to the defendant's age. (He was 18 years old at the time of the crime, and 20 at the time of the retrial that resulted in the death penalty.) Because age is a statutorily cognizable factor in mitigation (§ 190.3, factor (i)), defendant argues that Williams could not properly be excused for deciding in advance that one mitigating factor would outweigh all the aggravating factors in the case.

It is true that a juror, after hearing all the evidence, is permitted to conclude that one mitigating factor outweighs all the aggravating evidence the People produce. (See *People* v. *Lang* (1989) 49 Cal.3d 991, 1034 [264 Cal.Rptr. 386, 782 P.2d 627]; see also *People* v. *Andrews* (1989) 49 Cal.3d 200, 229 [260 Cal.Rptr. 583, 776 P.2d 285] [instruction that one mitigating circumstance can outweigh several aggravating ones minimized possibility that jury misunderstood its duty]; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 954 [258 Cal.Rptr. 242, 771 P.2d 1330] [same].) In other words, defendant argues prospective juror Williams's position on the appropriateness of the death penalty for those of tender years was permissible and thus not a ground for her removal from the jury.

In support, defendant relies on a footnoted passage in *Fields, supra,* 35 Cal.3d at page 358. In that passage, we stated that when a trial court excludes a juror because he or she would automatically vote against the

death penalty, the court "must take care to avoid violation of *Witherspoon*'s command that a juror can be dismissed for cause only if he would vote against capital punishment 'without regard to any evidence that might be developed at the trial of the case . . . .' [Citation.] If a prospective juror has been informed of the evidence to be presented, his asserted automatic vote may be based upon this information, in which case exclusion of the juror because of his views on the death penalty would violate *Witherspoon*." (*Fields, supra,* at p. 358, fn. 13; see also *People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127] [suggesting the *Witt* inquiry is whether juror would keep an open mind in the abstract, not on the specific facts of the case].)

We reject defendant's argument because the record does not support the proposition that prospective juror Williams based her views on evidence to be presented at trial. Although at one point she stated she would not dismiss factors other than the defendant's age, and that she would weigh them all, immediately thereafter she stated the "only" factors she would consider were defendant's age and the severity of the death penalty. She later averred she would vote for life imprisonment and "wouldn't care what the circumstances were," that she would "disregard" the other factors. It thus appears that although Williams was willing to consider *some* of the anticipated sentencing factors, she would not consider *all* of them. She thus did not have an open mind regarding the penalty determination. (Cf. *People* v. *Clark, supra,* 50 Cal.3d at p. 597 [the proper inquiry is "whether, without knowing the specifics of the case, the juror has an 'open mind' on the penalty determination."].)

To the extent the record is equivocal, we defer to the trial court's evaluation of Williams's state of mind. (*Hardy, supra,* 2 Cal.4th at p. 130; *People* v. *Cooper, supra,* 53 Cal.3d at p. 809.) We conclude the trial court could reasonably conclude that Williams's views on capital punishment would "prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." (*Witt, supra,* 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852]; see also *People* v. *Livaditis* (1992) 2 Cal.4th 759, 772-773 [9 Cal.Rptr.2d 72, 831 P.2d 297] [juror asserted she would not vote for death penalty given defendant's age and lack of prior murder convictions; held, juror properly excluded].) Accordingly, the trial court did not err by sustaining the prosecutor's challenge for cause.

2. *Wheeler/Batson*

Defendant was represented at trial by Attorneys Miller and Lenoir. During voir dire, Miller complained that the prosecutor used six of his first thirteen

peremptory challenges to excuse Black persons from the jury pool and asked the trial court to compel the prosecutor to explain the challenge. The trial court explained that it believed the motion was "premature," that no prima facie showing of group bias had been made, but that it would entertain a future motion on the issue. When the prosecutor then stated he intended to excuse an eighth Black juror, defense counsel again sought to have the trial court have the prosecutor explain his reasons. Again the trial court declined. Shortly thereafter, both sides accepted a jury that included eight Black jurors.

■ Defendant contends the trial court erred by declining to find a prima facie case of group bias. ■ It is well established that "peremptory challenges may not be used to exclude from a jury, solely because of a presumed 'group bias,' all or most members of an identifiable group of citizens distinguished on racial, religious, ethnic, or similar grounds." (*People v. Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452] [hereafter *Snow*]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] [hereafter *Wheeler*].) Such improper exercise of peremptory challenges violates article I, section 16, of the California Constitution (*People v. Turner* (1986) 42 Cal.3d 711, 716 [230 Cal.Rptr. 656, 726 P.2d 102]; *Wheeler, supra*, 22 Cal.3d at pp. 276-277), as well as the equal protection clause of the United States Constitution (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]).

"If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Wheeler, supra*, 22 Cal.3d at p. 280; see also *Snow, supra*, 44 Cal.3d at p. 222, fn. omitted.) If the trial court finds the moving party has made a prima facie case, the burden shifts to the opponent to explain its peremptory challenges. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047].)

■ Respondent argues defendant waived the issue for appeal by failing to raise it in timely fashion in the trial court. The record shows the trial court initially denied defendant's *Wheeler* motion without prejudice to a renewed motion, noting that the percentage of Blacks that were excused would be

more meaningful at a later point in the voir dire. We express no opinion on the correctness of that decision because later, defense counsel clearly and unequivocally withdrew the *Wheeler* motion. The record shows a dispute arose concerning whether defendant had a pending *Wheeler* motion, and whether he wanted to pursue it. As defendant now argues, there was some confusion over the proper procedure for bringing a *Wheeler* motion; it appears that defense counsel confused a *Wheeler* motion requiring the prosecutor to explain his reasons for challenging certain jurors with a motion to quash the jury due to the prosecutor's failure to provide an adequate explanation for his challenges. Indeed, as defendant argues, it appears defense counsel may have mistakenly believed he could not make a *Wheeler* motion until the trial court declared sua sponte that a prima facie showing of group bias had been made.

Despite such confusion, the record is clear that defense counsel decided later to abandon any *Wheeler* challenge. When asked whether defendant still wished to pursue a *Wheeler* motion, defense counsel Miller stated: "I merely . . . asked the court to make a finding that there is a possible systematic exclusion at which point then the court would require the prosecutor to give a reason for excusing any subsequent juror [¶] *I never made a Wheeler motion and I never intended to make a Wheeler motion.*" (Italics added.) Later, Miller affirmed that "*by accepting the jury as it's presently constituted . . . I'm not asking for any motion at this point.*" (Italics added.)

The trial court sought confirmation: "Now, just so the record is clear, you have not made and are not making at this time a *Wheeler* motion; is that correct?" Miller's response again betrayed a belief that he could not make a *Wheeler* motion until the trial court made a finding of a prima facie showing of group bias. The trial court explained the proper procedure and finally asked: "So you're not requesting the court at this time to have [the prosecutor] explain on the record why he excused . . . the jurors . . . by way of peremptory challenge?" Defense counsel agreed that no motion was being made.

Although the record reveals some confusion, we believe defense counsel Miller and Lenoir ultimately pronounced themselves satisfied with the jury and abandoned the *Wheeler* motion they had previously made. Despite the confusion apparent in the record, the trial court carefully permitted defense counsel to renew their earlier *Wheeler* motion and counsel declined. On this record, we conclude defendant abandoned his *Wheeler* motion. Accordingly, the issue was waived for appeal.

### 3. Removal of Juror Ashe and Substitution With Juror Ricks

#### a. Removal of Juror Ashe

The jury commenced its deliberations on July 29, 1987. At that time, Juror Ashe sent the trial court a note indicating she had an August 7 appointment concerning a new job that was set to begin on August 23. On July 31, Ashe sent the trial court another note, indicating that because of the impending starting date of her new job and because her daughter was moving, "This would be an inconvenience [due] to the time of deliberating. It may also have an effect on my decision." As a result of the note, the trial court held a hearing and questioned Juror Ashe. When directly asked whether her anxiety over her new job would affect her deliberations, however, she replied in the negative. The trial court then directed her to return to the jury room and continue deliberating.

On August 10, the jury returned verdicts of guilty on three of the five murder counts. After the jury was polled, it returned to deliberate the remaining counts. The trial court then discussed with counsel another note from Juror Ashe, received that same day, in which she again asked the court to discharge her. Neither the defense nor the prosecution asked that she be discharged. The trial court then brought in the juror and the following colloquy occurred:

"The Court: Now, do you think that these employment problems or personal problems that you have will affect your deliberations in any way?

"Juror Ashe: Yes.

"The Court: You feel that these problems might affect your deliberations?

"Juror Ashe: Yes, it would cause me some anxiety, yes.

"The Court: Well, in addition to causing you any anxiety, *will these problems affect your actual deliberations in this case?*

"Juror Ashe: *Oh, no sir.*

"The Court: *So these problems will not have any effect on your deliberations with regard to the remaining counts?*

"Juror Ashe: *No sir.*" (Italics added.)

Juror Ashe then asked if she could contact her employer and the court agreed. After speaking to her employer, Juror Ashe again asked to be

discharged from the jury, explaining that "my manager said that I had to fill out paperwork so that they can vacate my spot from my present employer." The trial court asked her: "Do you feel that the fact that you're needed at your present employment to perform the functions that you've described in order to start your new employment would have an effect on your deliberations in this case?" This time she replied in the affirmative. The court asked if either side had any questions for the juror; both declined. The court then asked Juror Ashe: "[D]o you feel that if you were asked to remain on this jury and to continue to deliberate[,] the personal problems that you've indicated to the Court may affect your verdict . . . and your deliberations [in this case]?" Ashe replied: "Yes, your honor." The trial court then found good cause and discharged her from the jury.

■ Defendant contends the trial court erred by failing to make an inquiry into Juror Ashe's possible bias or impartiality following receipt of the August 10th note, but *before* the taking of verdicts on the three murder counts. He speculates that sometime after Ashe's July 31st note, but before the August 10th note, she lost her ability to be impartial. We disagree.

Section 1089 provides that "[i]f at any time, whether before or after the final submission of the case to the jury, a juror . . . requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall take his place in the jury box. . . ." (See also Code Civ. Proc., § 233.) "The determination of 'good cause' rests in the sound discretion of the court [citations], and the court's finding thereof will be upheld if substantial evidence supports it (*People* v. *Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251])." (*People* v. *Johnson* (1993) 6 Cal.4th 1, 21 [23 Cal.Rptr.2d 593, 859 P.2d 673]; see also *People* v. *Zapien* (1993) 4 Cal.4th 929, 997 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 467 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

In this case, the record reveals Juror Ashe affirmatively stated on July 31st that her anxiety over her new job would *not* affect her deliberations. On August 10th, after the court received the three murder verdicts, the court twice asked Ashe whether her problems would affect her deliberations. She twice replied in the negative. *It was only after she spoke on the telephone with her employer* that she—for the first time—informed the trial court that her anxiety over the paperwork she must complete to terminate her position at her present employer would affect her ability to deliberate. It was at that point the court excused her.

The record thus supports the trial court's ruling that good cause to excuse Juror Ashe did not exist until after she spoke with her employer on the

telephone on August 10th. Indeed, just prior to calling her employer, she had affirmed her ability to remain impartial. Under these circumstances, the trial court's failure to hold a hearing before taking the partial verdicts was not error. We also conclude the trial court's finding of good cause to excuse juror Ashe after her phone call to her employer was supported by substantial evidence. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 21.) Accordingly, the trial court did not abuse its discretion by excusing Juror Ashe.[6]

### b. *Substitution of Juror Ricks*

■ Following the receipt of guilty verdicts for three of the five charged murder counts, the trial court excused Juror Ashe and replaced her with Ricks, an alternate juror. The court then instructed the jury to begin its deliberations anew. (See CALJIC No. 17.51.) After additional deliberation, the reconstituted jury found defendant guilty of the remaining two counts of murder and sustained the charged special circumstance allegation. Although defendant concedes an alternate juror may be substituted into a jury after a case is submitted for deliberations (*People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]; § 1089), he argues it was error to substitute Juror Ricks *after* the original jury had returned *a partial verdict.*

The only two cases that have addressed the issue in California both permit juror substitution following the return of a partial verdict. (*People* v. *Thomas* (1990) 218 Cal.App.3d 1477 [267 Cal.Rptr. 865]; *People* v. *Aikens* (1988) 207 Cal.App.3d 209 [254 Cal.Rptr. 30]; see also *Fields, supra,* 35 Cal.3d at 351, fn. 9 [permissible to substitute a juror after the guilt phase of a capital trial].) Defendant argues these cases failed to give sufficient weight to the unlikelihood that the 11 remaining jurors could begin their deliberations anew when they had already reached verdicts on some counts. He urges this court to instead adopt the views of the New Jersey Supreme Court in *State* v. *Corsaro* (1987) 107 N.J. 339 [526 A.2d 1046], which found postverdict juror substitution was plain error requiring reversal.

Whatever the merits of defendant's argument, however, we agree with respondent that defendant waived this issue for appeal by failing to object to the juror substitution, or to otherwise move for a mistrial on this ground.

[6]Respondent argues defendant waived this issue for appeal by failing to object. The record is confusing on this point. For example, the trial court asked defense counsel Lenoir if he was objecting to Ashe's excusal. Lenoir replied: "At this early stage, *yes* . . . ." (Italics added.) Just afterwards, however, he affirmed he had no request of the court regarding Ashe's excusal. Before Ashe was excused Lenoir declined the trial court's offer to question the juror. Similarly, Lenoir did not object at that point. The record is thus unclear whether Lenoir objected. Inasmuch as we find substantial evidence to support the trial court's decision to excuse Ashe, we need not resolve the waiver issue.

After instructing the jury to begin its deliberations anew, the prosecutor stated the instruction should be clarified for the jury so it would understand it was not to renew its deliberations for the counts for which it had already reached a verdict. Asked for comment, defense counsel Miller stated he had none, and Lenoir submitted the matter. After the instruction was clarified, both defense counsel specifically declined to ask for additional or supplementary instructions. There was no objection. On this record, we conclude defendant waived the issue of the propriety of the substitution of Juror Ricks.

Defendant raises a variety of reasons why the issue was not waived. First, he argues that the reason for an objection is to place the trial court on notice of the issue so that it may avoid the error. (*People* v. *Velasquez* (1980) 26 Cal.3d 425, 444 [162 Cal.Rptr. 306, 606 P.2d 341], judgment vacated and case remanded in *California* v. *Velasquez* (1980) 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated *People* v. *Velasquez* (1980) 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952].) Nothing in the record, however, indicates the court was aware of a potential problem with the juror substitution. Second, defendant argues the right to an impartial jury cannot be waived. Even assuming that is true, there is no evidence showing alternate juror Ricks was a biased juror. Thus, defendant's argument concerning corrupt and prejudiced jurors misses the mark.

Third, defendant claims any such waiver must be personal. This argument relies on a dual premise: (1) that the substitution of Juror Ricks injected a biased juror into the jury room, and (2) that the substitution denied defendant his right to a jury trial. Because there was no evidence showing Ricks was biased, or that the jury did not follow the court's instruction to begin its deliberations anew, neither premise is supported by the record. Defense counsel's failure to object on this point was similar to the decision not to challenge a prospective juror on voir dire: it was a tactical decision well within the perimeter of counsel's authority. Indeed, inasmuch as Juror Ashe had just voted to convict defendant of three counts of first degree murder, it appears counsel's decision not to object to the substitution may well have had a tactical purpose. We thus conclude defendant waived this issue by failing to object.

*Guilt Phase Issues*

1. *Exclusion of Hearsay*

The evidence against defendant fell largely, although not exclusively, into two major groups: eyewitness identification and inmate informant evidence.

To attack the latter type of evidence, defendant attempted to show the inmates that testified against him—Austin Willis and David Gerhardt—falsified their accounts after being supplied with, or themselves obtaining, information about defendant's crime.

For example, when questioning Frederick Cole, defense counsel elicited the fact that while in county jail, Cole was approached by police and representatives from the district attorney's office and shown pictures and written material. They discussed certain things with Cole. The clear implication was that they were attempting to persuade Cole to testify against defendant. When counsel asked Cole directly what he had been told, however, the prosecutor successfully objected on hearsay grounds.

Raphael Calix testified that Gerhardt asked him for information about defendant's case, and that Willis asked him to say that defendant told him about the crime. Calix further testified that while incarcerated at the California Institution for Men at Chino, he knew a man named McDaniels. One day he saw McDaniels speaking to Detective Dufort, who was the investigating officer in defendant's case. When defense counsel asked Calix what written materials Dufort gave McDaniels, the trial court sustained the prosecution's hearsay objection. Other questions aimed at fleshing out Dufort's alleged attempt to convince McDaniels to testify against defendant were also subject to successful hearsay objections.

Anthony Evans testified that after the shooting at Traci Berry's party, some members of the Crips held a meeting and discussed who might be responsible. The trial court sustained the People's hearsay objections to this line of questioning and refused to permit Evans to repeat what was said at the meeting.

■■ Defendant contends the trial court erred by sustaining the People's hearsay objections in the instances discussed above. Because the information was not sought for its truth, but simply to show that the prosecution was attempting to manufacture testimony against (or suppress evidence for) defendant, he claims the information was not hearsay. He further claims his inability to present this evidence denied him his due process right to present a defense.

First, we reject this latter claim: by sustaining the People's hearsay objections in these instances, the trial court's alleged error, if error, did not rise to the level of an unconstitutional deprivation of the right to present a defense. ■■ ■■ As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right

to present a defense." (*People* v. *Mincey, supra,* 2 Cal.4th at p. 440; see *People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 58 [14 Cal.Rptr.2d 133, 841 P.2d 118].) If the trial court misstepped, "[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." (*In re Wells* (1950) 35 Cal.2d 889, 894 [221 P.2d 947].) Accordingly, the proper standard of review is that announced in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

Second, assuming defendant is correct and defense counsel's questions did not call for hearsay, we agree with respondent that any error was harmless. Cole testified without objection that representatives of the district attorney's office approached him and attempted to persuade him to act as an informant in defendant's case. He was given written material containing information regarding the victims. The clear implication was that the prosecution may have been attempting to manufacture inmate testimony against defendant.

Although the trial court sustained some hearsay objections when defense counsel was questioning Calix, the inmate was able to testify without objection that David Gerhardt spoke to him about defendant's case and tried to obtain some information from him, including who was involved in the case. Calix also testified that (1) Austin Willis asked him to "go along with him in saying that Mr. Fudge told me about the case," and (2) McDaniels, a Chino inmate, asked him to obtain information about defendant and his crimes. It was thus clearly implied that the two inmates who testified for the prosecution, as well as McDaniels, were gathering evidence about the crime, possibly to fabricate a story that defendant confided his guilt to them.

Anthony Evans's testimony regarding the postcrime Crips meeting was of less importance. The record nevertheless shows that while Evans was not allowed to describe the comments at the meeting, he testified without objection that although many persons were saying defendant was guilty, he personally believed defendant was innocent.

Thus, assuming the trial court erred by sustaining the hearsay objections described above, much of the evidence was ultimately placed before the jury.

In light of the numerous eyewitness identifications of defendant, his apparent motive to retaliate for the car theft, his admission of guilt to Angela Miller, the evidence that Sidney Garrett overheard defendant admit his guilt, and the graffiti found in defendant's cell implicating him in the crime, we cannot say it is reasonably probable that the jury would have reached a more favorable verdict in the absence of any such assumed error. (*People* v. *Watson, supra*, 46 Cal.2d at p. 836.) Accordingly, we find any such error was harmless.

### 2. *Jury View*

There was a conflict in the testimony regarding whether defendant threatened Austin Willis while they were both being held in the "service area," a secured area where inmates are housed while they wait for their turn to testify. Steve Mason, an inmate present in the service area with defendant, testified he heard defendant tell Willis, "What's up? Let up on me. I already have one hung jury." Mark Brown, another inmate in the service area at the time, testified he observed defendant gesture with his hand that Willis should be killed. This account was contradicted by Eddie Land, a defense witness, who testified he observed no threatening gesture, and further stated that defendant's hands were handcuffed behind him, making it impossible for him to make such a gesture.

The trial court gave defense counsel permission to view the service area. On returning to the court, they moved to have the jury view the area, explaining that it was much larger than the witnesses had indicated, and that the size, plus its physical configuration, rendered it very unlikely prosecution witnesses Brown and Mason could have seen defendant speaking or gesturing. The trial court deferred the matter and, when defense counsel later renewed their motion for a jury view, the court denied it.

■ Defendant contends the trial court abused its discretion by denying the motion for a jury view of the service area. ■ "The standard of review for a trial court's decision to grant or deny a request for a jury view is abuse of discretion. [Citation.] When the purpose of the view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view." (*People* v. *Price* (1991) 1 Cal.4th 324, 422 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

■ In this case, when Lenoir first argued that a view was necessary to show the jury how large the space was, the trial court deferred the matter,

explaining that defendant "could present that evidence in another manner rather than having the jury actually view the area. Diagrams can be obtained or other means used to obtain the measurements." When Lenoir renewed his motion for a jury view, the trial court denied it, reiterating the possibility of using diagrams, and noting that diagrams would be "more convenient and would obviate the necessity of security problems involved in bringing the jury to a lockup area of this criminal courts building."

Defendant contends the trial court's reasoning was flawed, arguing that (1) "[d]iagrams could not form the basis for the defense theory of the impossibility of the testimony of Brown and Mason," (2) obtaining diagrams would have been less convenient "and probably would have been disallowed in any case," and (3) the fear of security problems was mere speculation.

We are unpersuaded that the trial court's considered views in this matter were arbitrary or capricious. (Cf. *People* v. *Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79] [abuse of discretion standard means trial court's decision should not be overturned on appeal except on showing discretion was exercised in "arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice"].) The trial court may have been aware of the physical configuration of the service area and the usefulness of diagrams. Presumably the trial court was aware of potential security issues. In addition, defendant presents nothing that shows diagrams would have been insufficient. Finally, defendant does not explain why diagrams "probably would have been disallowed in any case." Accordingly, we conclude the trial court did not abuse its broad discretion when it denied defendant's motion for a jury view of the service area.

### 3. *Denial of Continuances*

Defendant next contends the trial court's denial, in two instances, of a request for a continuance denied him his constitutional right to compel the attendance of witnesses pursuant to the Sixth and Fourteenth Amendments to the United States Constitution. " 'The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction.' " (*People* v. *Zapien, supra,* 4 Cal.4th at p. 972, quoting *People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr.

425, 501 P.2d 1145].) Entitlement to a midtrial continuance requires the defendant "show he exercised due diligence in preparing for trial." (*People v. Danielson* (1992) 3 Cal.4th 691, 705 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

 Defendant complains the trial court abused its discretion in denying continuances in two instances when defense counsel—allegedly through no fault of their own—were not prepared to call their next witness. It is not clear in either instance, however, that counsel actually articulated they were requesting a continuance. Assuming for sake of argument that such requests were made, we conclude the trial court did not abuse its discretion by denying them.

The first instance occurred on July 6, 1987. Defense counsel argued they had insufficient time to interview several witnesses who had been transported from state prison to county jail. Counsel explained they were in court all day and the witnesses were not transported from the service area to county jail until after the 10 p.m. closing time for attorney visits.

The trial court replied: "I want you . . . to understand that I'm fully cognizant of the gamesmanship which is being demonstrated at this point." The court noted the witnesses had been removed from prison more than a week earlier, and concluded: "This is a ploy by the defense to obtain indirectly that which the court has indicated the defense cannot obtain on the record, that is, a delay of the proceedings to allow counsel an opportunity to confer with witnesses when the lack of a convenient opportunity is counsel's responsibility and not the court's." The court reminded counsel that it had previously instructed them to have their witnesses ready and to proceed in timely fashion.[7]

The second instance occurred a few days later. Defense counsel indicated they had no more witnesses ready for that day. The trial court noted that counsel had several potential witnesses in the secured lockup area. Miller and Lenoir explained that they had not had an adequate opportunity to interview those witnesses. The court directed counsel to call a witness or be held to have rested their case, explaining: "I will not tolerate . . . tactics which are directed clearly to delay these proceedings so that you can interview witnesses as you have requested numerous times in the past. [¶] As

---

[7]Earlier in the proceedings, the court had cautioned defense counsel against employing what it considered were delaying tactics and stated: "I will indicate clearly on the record at this time that I will not tolerate any further ploys, actions or maneuvers on the part of the defense to delay these proceedings in any manner whatsoever in the future." The court later explained that there were "numerous" delays attributable to the defense in defendant's first trial, and warned defense counsel that the court expected counsel to be ready to proceed on June 29, 1987, with all defense witnesses ready by that date.

I've indicated, I will not allow you to obtain indirectly what I'm ordering you not to obtain directly [presumably, a midtrial continuance to interview defense witnesses]."

It thus appears the trial court perceived subtle actions by defense counsel as delay tactics (see *People* v. *Collins* (1966) 242 Cal.App.2d 626, 637 [51 Cal.Rptr. 604] [proper for trial court to "recognize counsel's attempted withdrawal as a device to force a postponement of the trial"]), and was attempting to ensure the trial proceeded in timely fashion. Contrary to defendant's arguments, this is not a case in which the trial court's denial of a midtrial continuance denied defendant his right to prepare adequately for trial. (See, e.g., *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 876 [59 Cal.Rptr. 440, 428 P.2d 304]; *People* v. *Fontana* (1982) 139 Cal.App.3d 326, 333 [188 Cal.Rptr. 612].) Instead, the record shows that defense counsel had been warned repeatedly by the trial court to have their defense ready. Moreover, counsel had represented defendant for more than two years.

Under these circumstances, we find that defendant did not demonstrate to the trial court, and does not demonstrate to this court, that he was diligent in preparing for trial. (*People* v. *Danielson, supra,* 3 Cal.4th at p. 705.) Accordingly, we conclude that—assuming defendant timely moved for a continuance—the trial court did not abuse its discretion by denying the motions.

### 4. *Alleged Disparagement of Defense Counsel*

 Defendant contends that throughout his trial, the trial court repeatedly disparaged his defense attorneys, Lenoir and Miller. Defendant claims this constant and allegedly condescending treatment of defense counsel violated his right to the effective assistance of counsel under the Sixth Amendment, as well as his due process right to a fair trial. A trial court commits misconduct if it "persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense . . . ." (*People* v. *Mahoney* (1927) 201 Cal. 618, 627 [258 P. 607]; see also *People* v. *Fatone* (1985) 165 Cal.App.3d 1164, 1169 [211 Cal.Rptr. 288].) After scrutinizing the instances of alleged judicial misconduct, we find no grounds for relief.

Defendant first complains of an instance in which Miller asked that a witness's answer be reread because he had not heard it. Upon ascertaining that the jury had heard the answer, the court merely had the reporter read back the answer to counsel at counsel's table. Defendant contends this

demonstrates how the trial court subtly disparaged defense counsel before the jury.

There are two answers to this. First, counsel neither objected nor did he request the jury be admonished. Accordingly, defendant waived the issue for appeal. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 468 [276 Cal.Rptr. 356, 801 P.2d 1107]; *People* v. *Wright* (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221; *People* v. *Terry* (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961].) Second, assuming for argument that the issue was preserved for appeal, we deem the trial court's action in this regard merely one of exercising its reasonable control of the trial. (See *People* v. *Blackburn* (1982) 139 Cal.App.3d 761, 764 [189 Cal.Rptr. 50]; § 1044 ["It shall be the duty of the judge to control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."].) Although defendant argues it would have been quicker just to have the reporter read back the answer in open court, we defer to the trial court's decisions to control the proceedings over which it presides absent clear evidence of bias or other misconduct.

Other instances of alleged judicial misconduct involve the trial court's refusal to allow counsel to argue the grounds for an evidentiary objection, or to permit defense counsel to approach the bench for a sidebar conference to discuss evidentiary objections. There were several times when the trial court declined to hold a sidebar conference, and there were no objections to this alleged misconduct. (*People* v. *Anderson*, *supra*, 52 Cal.3d at p. 453.) One time when a conference was allowed, Lenoir objected "to the court's gyrations when I ask to approach the bench." With one exception, then, it appears defendant waived the issue for appeal.

Assuming the issue was not waived for appeal, however, it is meritless. The trial court cautioned counsel early in the trial that it was not inviting argument on every evidentiary objection, and explained that it was concerned that the attorneys were spending too much time "at side bar as compared to presenting the case before this jury." If the parties felt a conference was necessary, however, the court instructed them to continue to ask for one and if the court felt one was appropriate, it would allow one. It thus appears the trial court was merely exercising its power to control the trial. (*People* v. *Blackburn*, *supra*, 139 Cal.App.3d at p. 764; § 1044.) There is, of course, no right to approach the bench to argue points of law. (*People* v. *Alfaro* (1976) 61 Cal.App.3d 414, 425 [132 Cal.Rptr. 356].) Moreover, the record does not reveal the trial court treated defense counsel unfairly as compared to the prosecutor; defense counsel were allowed to approach the bench quite regularly. Accordingly, we perceive no judicial misconduct.

 Lastly, defendant complains the trial court made comments insinuating that defense counsel did not know what they were doing. In one instance, in response to Lenoir's hearsay objection, the court stated, "I'll refer counsel to Evidence Code section 1237 . . . . [¶] If you wish to read the section . . . I'll furnish it to you." Later, when questioning a witness about a certain page of a document disclosed during discovery, Lenoir admitted he did not have a copy of the document to show the witness. The trial court then stated: "Counsel, if you want to question the witness with regard to a specific document[,] you should have the document in court ready to question the witness." There was no objection to either instance of alleged misconduct. (*People* v. *Anderson, supra,* 52 Cal.3d at p. 453.)

Assuming the claims were preserved for appeal, we find no substantial prejudice in the first instance and no misconduct in the second. Although the trial court's tart comment regarding the Evidence Code comes close to impropriety, we note the parties held a sidebar conference at which Lenoir prevailed. Back before the jury, the trial court granted Lenoir's motion and ordered certain testimony stricken. Any prejudice was therefore ameliorated. Regarding the second comment, Lenoir explained that he did not have a copy of the statement with him and that was why he was questioning the witness. The witness was then excused subject to recall, with instructions for the witness to locate the document in question. Under these circumstances, we perceive no misconduct.

### 5. *Instruction on Eyewitness Identification*

Defendant presented the testimony of Dr. Kathy Pezdek, an expert on eyewitness identification, to explain potential problems with the accuracy of such identifications. The People did not present their own expert on the subject. After both sides rested, defendant requested a special instruction relating to Dr. Pezdek's testimony.[8] The prosecutor filed written points and authorities in opposition and, after argument, the trial court denied defendant's request for the instruction. Defendant contends the trial court committed reversible error by refusing the instruction.

---

[8]The proposed instruction, designated Defendant's No. 2, stated: "Many factors can affect the accuracy of eyewitness identification. In determining the weight to be given the eyewitness identification testimony in this case, you should first consider the factors I have previously mentioned that may affect the testimony of all witnesses generally. But you should consider other factors that may particularly affect eyewitness identification testimony. Some are known to you from personal experience, while others have been the subject of specific study and proof. Among the more important factors to consider are the following:[ ]

"Did the witness have an adequate opportunity to observe the person who committed the crime? In answering this question, you should take into account such matters as the length of time the witness saw the offender, their positions and distance between them, the lighting

A criminal defendant "is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1230 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Wright* (1988) 45 Cal.3d 1126, 1138-1144 [248 Cal.Rptr. 600, 755 P.2d 1049] [hereafter *Wright*].) An explanation of the effects of such factors, however, "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Wright, supra,* at p. 1143, fn. omitted.)

We reject at the threshold the People's argument that defendant's proposed instruction improperly incorporated Dr. Pezdek's opinions and restated them as facts. To the extent that the proposed instruction was argumentative, the trial court should have tailored the instruction to conform to the requirements of *Wright, supra,* 45 Cal.3d 1126, rather than deny the instruction outright. (*People* v. *Hall* (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826].)

Although we find the trial court erred by refusing to give at least a revised version of the proposed instruction, our examination of the entire record convinces us that the error was harmless. First, although the eyewitness identifications of defendant as one of the shooters at Traci Berry's party was an important part of the prosecution's case, the overall strength of the evidence of defendant's guilt demonstrates the omission of the instruction was harmless. In addition to the eyewitness identifications of defendant as one of the shooters, Sidney Garrett testified he overheard defendant admit his participation in the shooting, boasting that he "sprayed [the victims] real good VNG style." Angela Miller also testified defendant confessed his guilt

---

conditions, and the presence or absence of any circumstances that might focus or distract the witness' attention.

"Was the witness already familiar with the offender, or were they strangers? In general, people are better at identifying persons they already know than persons with whom they have had no previous contact.

"Was the witness's memory affected by intervening time and events? Memory tends to fade over time. And studies show that a witness may subconsciously incorporate into his memory information from other sources, such as descriptions by other witnesses.

"Did the witness identify the defendant before the trial, either from photographs or in a lineup? If so, were the photographs or the lineup suggestive in any way? An identification made from a lineup tends to be more reliable than when he views the defendant alone.

"[On any occasion before trial did the witness fail to identify the defendant, or did he identify someone else as the offender?]

"I remind you that no single factor determines the reliability of an eyewitness identification. The presence of one or more factors in a particular case may offset the effect of others. In weighing the identification testimony of an eyewitness, you should therefore evaluate all the relevant evidence, both positive and negative, that may bear on the accuracy of that testimony."

to her. Two county jail inmates, Willis and Gerhardt, testified that defendant confessed his guilt to them. Defendant had an apparent motive for the crime, seeking to retaliate for the car theft. Finally, defendant's cell was found covered in graffiti in gang jargon that, as interpreted by a a police expert, claimed responsibility for the shooting at Berry's party. Thus, even setting aside the eyewitness identifications of defendant, the evidence of his guilt was strong. (*Wright, supra,* 45 Cal.3d at p. 1145.)

Second, although defendant's proposed instruction was refused, defense counsel expounded on this point at length in his closing argument. Counsel summarized Dr. Pezdek's testimony concerning how memory works, how people tend to exaggerate the length of time they believe they have viewed an event, the importance of the length of time a witness views an event, the phenomenon of "weapon focus," the fact that the accuracy of memory tends to decrease over time, that witnesses are better able to recognize persons with whom they are already familiar,[9] and the false confidence an eyewitness may feel in the accuracy of an identification. Although counsel's arguments are not a substitute for a proper jury instruction, such detailed argument supports our conclusion that the error in refusing the instruction was harmless in this case. (*Wright, supra,* 45 Cal.3d at p. 1148.)

Third, the trial court gave several standard jury instructions relevant to eyewitness identification. For example, the court instructed the jury that it was the sole judge of the credibility of the witnesses (CALJIC No. 2.20), that "[f]ailure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently" (CALJIC No. 2.21.1), and that for lay witnesses, the jury should consider "the extent of [the witness's] opportunity to perceive the matters upon which his opinion is based . . . ." (CALJIC No. 2.81.) The court also explained that the jury should give defendant the benefit of any doubt "[i]f, after considering the circumstances of the identification [of defendant], . . . you have a reasonable doubt . . . ." (CALJIC No. 2.91 (1982 rev.).) As in *Wright, supra,* 45 Cal.3d 1126, "[a]lthough these instructions did not list [any] specific factors . . . , they directed the jury's attention to the issue of the reliability of the identifications, and generally covered the areas on which defendant's requested instruction focused." (*Id.* at p. 1150.)

In light of these factors—the overall strength of the evidence of guilt, the detail in defense counsel's closing argument, and the other jury instructions

[9]This factor was important because some of the witnesses did not initially identify defendant as the shooter, although they were familiar with defendant. This raised the possibility of a phenomenon called "unconscious transfer" in which comments the witness hears after the event are unconsciously incorporated into the "memory" of the event.

—we conclude the trial court's error in failing to deliver a revised "pinpoint" instruction directing the jury's attention to the problematic nature of eyewitness identifications was harmless. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836; *Wright, supra,* 45 Cal.3d at pp. 1144, 1152 [applying *Watson* to the identical error].)

*Penalty Phase Issues*

1. *Skipper Error*

Defendant contends his penalty judgment must be reversed because the trial court erroneously excluded mitigating evidence at the penalty phase.

a. *Preliminary Factual Background*

Lawrence Wilson testified briefly at the penalty phase of defendant's trial. Wilson stated he was a 26-year veteran of the California Department of Corrections, having served as a deputy warden at Folsom state prison, as Warden at both Soledad and San Quentin prisons, and as Deputy Director of the Department of Corrections. He retired in 1970 and considered himself an expert in penology. When defense counsel asked Wilson to describe the "execution ritual" of a person on death row facing an imminent execution, the prosecutor successfully objected to this line of questioning. Counsel then questioned Wilson about "life termers." The prosecutor again objected, explaining that he was opposed "to any opinion given by this—this witness as to projecting Mr. Fudge's future—future conduct in the state prison." He argued that such evidence does not fall within any statutory category of mitigating evidence. (See § 190.3.) The trial court seemed inclined to agree.

Defense counsel Lenoir attempted to elucidate the defense's position: "[Wilson would testify] that Keith Fudge is a suitable candidate for life without the possibility of parole. That being the fact, [Wilson is] entitled to show the basis for it, and the basis for it is that—to show how life is lived there and what they do with lifers as opposed to [condemned inmates]." Noting that penalty phase evidence must relate to the offense or the offender, the trial court replied: "Your proffered testimony has no relevancy to these issues." The prosecutor pointed out that, due to the People's objection, Wilson had not yet testified that defendant was a suitable candidate for a life term. The court indicated it was sustaining the prosecutor's objection to this line of questioning.

When the proceedings resumed after a recess, the parties continued arguing the point. Defense counsel sharpened their explanation of the relevance

of Wilson's proposed testimony, stating that a description of the conditions of confinement of a life term prisoner "goes to the possible rehabilitation of a prisoner and the positive things that this warden knows that prisoners that are serving life imprisonment without the possibility of parole have to contribute to the entire prison facility and how they affect other inmates, how they affect recidivist criminals."

Recognizing the mandate of *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669], the trial court assured counsel it would not exclude evidence of *past* good behavior while confined. The court opined, however, that expert opinion evidence "as to whether or not this defendant is adaptable to life imprisonment without the possibility of parole . . . is invading the province of the jury and it usurps the function of the jury." The prosecutor added his view that testimony concerning predictions of a lack of future dangerousness was inadmissible under *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767-775 [175 Cal.Rptr. 738, 631 P.2d 446]. After additional argument, the trial court permitted defendant to make an offer of proof outside the presence of the jury.

b. *Wilson's Offer of Proof*

After briefly describing the physical isolation of prisoners on death row, Wilson explained that life term prisoners were housed in the "general mainline." He explained, however, that such prisoners were different from the regular prisoners, in that they generally led exemplary prison lives and avoided disciplinary problems. In addition, Wilson said such life prisoners have a positive effect on the non-life prisoners, commanding "some respect from the general population people." Wilson noted that prison officials rely on life prisoners to help control the other prisoners, that they work in the prison, and that the money they earn "used to be sufficient to care [for] all their canteen needs." In response to defense questioning, he stated that life prisoners have a high degree of rehabilitation.

Wilson testified he spoke to defendant for 45 to 60 minutes the day before he testified. When asked about defendant's suitability as a life prisoner, he averred that defendant would make a good life prisoner, noting "he can be taught to work by his hands. He has an interest in doing different kinds of vocational work, he says, and I can believe that maybe his job record in the past is not too—not too bright, but let's consider being in prison for 20 years, maybe 30 years, there gives an opportunity for upgrading, and as long as he's going to do the time, I think he could do that very well." In addition, Wilson said defendant, as a life prisoner, would have a positive influence on other, non-life, prisoners.

On cross-examination, the prosecutor established that Wilson had left the prison system in 1970, or 17 years before defendant's 1987 trial, and that much had changed in that time. Although the prosecutor questioned the validity of Wilson's observations about life term prisoners as a group by noting that many in the group were eligible for parole, Wilson replied the group included prisoners serving a life term without the possibility of parole. Wilson clarified that when he stated life prisoners "simmer down," he was not speaking of "this year and, maybe next year. I'm talking about . . . what's going to be happening to those folks, the next five years and ten years."

The prosecutor then attempted to probe whether defendant would participate in gang activity if permitted to spend his life in prison. Wilson responded that after speaking to defendant about that possibility, he was "quite sure" that defendant was sincere when he said he would not be interested in gang activity. "[Defendant] has all this long time ahead of him and the average man is so smart that he can't afford to live his whole life and be in the adjustment centers where all these killers and violen[ce] prone people are housed. [¶] Now, those people are going to come out again, most of them, but these lifers are not coming out and so they don't want any part of that."

Wilson admitted that the "majority" of what he knew about the case came either from defendant or his defense attorneys, and that he had not read the transcripts of the case. Wilson stated that although defense counsel had not informed him defendant had threatened a witness, it would not change his opinion that defendant would make a good life prisoner. "I would look at him who committed these crimes around 18 years old, now three years hence, and comparing him with other people I've seen in many like circumstances and knowing that he'll grow up. I'm quite sure he will. It's my opinion he'll grow up and be a good mainline [prisoner]."

When the prosecutor asked Wilson the basis for his conclusion that defendant would be a good mainline prisoner, Wilson replied: "First, he wanted to live, and secondly, he wanted to do something with his hands, he wanted to work and maybe contribute to the prison. He showed an interest in education."

Following the close of the offer of proof of Wilson's proposed testimony, the prosecutor objected to its admission, arguing that Wilson's evidence was both irrelevant and lacked an adequate foundation. The trial court agreed and sustained both objections, adding that it thought Wilson's testimony "usurp[ed] the jury's function and invades the province of the jury." It was understood by the parties that the same ruling applied to the proposed

testimony of Byron Eshelman, a prison chaplain, who would have testified similarly to Wilson.

c. *Lack of Foundation*

The proposed evidence was clearly relevant, as discussed below. Before turning to that point, however, defendant must overcome an initial obstacle: the trial court's determination that defendant failed to lay an adequate foundation to establish Wilson as an expert.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a); *People* v. *Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) " 'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement.' " (*Kelly, supra*, at p. 39, quoting *People* v. *King* (1968) 266 Cal.App.2d 437, 445 [72 Cal.Rptr. 478].) A trial court's decision on this ground is subject to the abuse of discretion standard. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 971 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Bloyd, supra*, at p. 357.)

It seems clear that Wilson, a former warden of both Soledad and San Quentin prisons, a former deputy warden at Folsom state prison, and a 26-year veteran of the Department of Corrections, had "special knowledge" and "experience" concerning the day-to-day life and adjustment of life prisoners in state prison, as well as whether defendant was the type of person that would fit into that social milieu. He had spoken to defendant personally and was aware of many aspects of defendant's crimes. It seems clear Wilson was qualified as an expert on the topic in question. (Cf. *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1026 [245 Cal.Rptr. 185, 750 P.2d 1342] [it was *Skipper* error to prevent mental health professional from giving opinion on whether the defendant was a recidivist] [hereafter *Lucero*]; see also *People* v. *McLain* (1988) 46 Cal.3d 97, 108 [249 Cal.Rptr. 630, 757 P.2d 569] [prison psychologist; foundational issues waived by the parties].)

The People argue that several factors undermined Wilson's qualifications as an expert. They point to the fact that: (i) Wilson had not been in the correctional system in 17 years; (ii) he admitted that much had changed in the interim; (iii) for much of Wilson's tenure as a warden, most life term prisoners had the possibility of parole, whereas many "lifers" today cannot be paroled; (iv) Wilson spoke to defendant for an hour at most just the day

before; (v) most of what Wilson knew of the case he learned from defense attorneys; (vi) he had not read the trial transcripts; (vii) he had not been told that defendant threatened a witness. Based on this record, the People argue the trial court did not abuse its discretion by ruling Wilson was not qualified as an expert.

We need not resolve this question because we agree with defendant's further argument that a fair reading of the record reveals no real discussion, argument, or dispute on this foundational issue. Instead, the record shows the prosecutor objected to Wilson's testimony *on relevance grounds*, and the trial court *sustained that objection*. Although the record admittedly is somewhat murky,[10] as defense counsel's questioning sought initially to elicit information about the "execution ritual" (presumably so as to distinguish it from the day-to-day life of a life term prisoner), the record—read as a whole—reveals the trial court's concern was with *the relevance* of the proposed evidence, not Wilson's *qualifications as an expert*.

There was much argument on the admissibility of Wilson's proposed testimony, but by the time defense counsel focused on the content of the testimony, the trial court spoke only of the relevance of it, at one point asking defense counsel, "[w]hat is *the relevance* of this witness description as to the day to day life in prison?" (Italics added.) The prosecutor specifically directed the court's attention to *People* v. *Murtishaw, supra,* 29 Cal.3d at pages 767-775, to argue the proposed testimony was *irrelevant.*

By the time the court agreed to permit defense counsel to make an offer of proof, it was understood that Wilson's testimony, out of the jury's presence, was to make a record vis-à-vis the relevance of the testimony, not to enhance the foundation of Wilson's expert qualifications. Indeed, counsel asked Wilson no further questions on his qualifications. Thus, even assuming for argument that the trial court did not abuse its discretion, we conclude that under the particular circumstances of this case, the trial court's ruling that defendant failed to lay an adequate foundation for Wilson's proposed testimony poses no barrier to appellate review of the issue.

d. *Exclusion of Wilson's Testimony*

Having concluded our consideration of this issue is not precluded by the alleged failure to establish an adequate foundation for Wilson's testimony, we turn to the merits. Two distinct aspects of Wilson's proposed testimony emerge from the record, and we thus treat each in turn.

---

[10]The prosecutor briefly mentioned a lack of foundation, as did the trial court.

### (i) *Execution Ritual*

To the extent defendant attempted to have Wilson testify concerning the procedures and performance of the actual execution, the so-called "execution ritual," the trial court correctly excluded this testimony. Evidence of how the death penalty will be performed, as well as the nature and quality of life for one imprisoned for life without the possibility of parole, is properly excluded. (*People* v. *Grant* (1988) 45 Cal.3d 829, 860 [248 Cal.Rptr. 444, 755 P.2d 894]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 139 [246 Cal.Rptr. 245, 753 P.2d 37].) "Describing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do." (*People* v. *Thompson, supra,* at p. 139.) That part of Wilson's proposed testimony that concerned the execution ritual was therefore properly excluded.

### (ii) *Future Dangerousness*

Defendant also claims that because Wilson's testimony would have described him as being a likely candidate to lead a productive and nonviolent life in prison, that testimony was relevant and admissible mitigating evidence. We agree. "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings* [v. *Oklahoma* (1982) 455 U.S. 104 (71 L.Ed.2d 1, 102 S.Ct. 869)], such evidence may not be excluded from the sentencer's consideration." (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7], fn. omitted [hereafter *Skipper*].) Nor is the evidence, as believed by the prosecutor below, barred by our rule in *People* v. *Murtishaw, supra,* 29 Cal.3d 733. That case was based on the unreliability of expert predictions of future dangerousness proffered by the prosecution. When such predictions are offered by the defense as a basis for a life sentence, such considerations do not apply. (*Lucero, supra,* 44 Cal.3d at p. 1026.)

Exclusion of this mitigating evidence thus violates the constitutional requirement that a capital defendant must be allowed to present all relevant evidence to demonstrate he deserves a sentence of life rather than death. (*Skipper, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7]; *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].) Exclusion of such evidence, called *Skipper* error, does not automatically require reversal, but is instead subject to the standard of review announced in *Chapman* v. *California, supra,* 386 U.S. 18, that is, the error is reversible unless it is harmless beyond a reasonable doubt. (*People* v. *Robertson* (1989)

48 Cal.3d 18, 55 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People* v. *McLain, supra*, 46 Cal.3d at p. 109; *Lucero, supra*, 44 Cal.3d at p. 1032.)

After a consideration of all aspects of this case, we conclude the error was harmless beyond a reasonable doubt. It is true, as defendant stresses, that the prosecution did not present any additional aggravating evidence at the penalty phase beyond those facts adduced at the guilt phase of the trial. Nevertheless, the facts of defendant's crime provided powerful aggravating evidence. Defendant, in a vicious, misguided effort at personal revenge, sprayed a large group of innocent, unarmed people with gunfire, leaving five persons dead, including a thirteen-year-old child. Several other potential victims miraculously managed to avoid the deadly gunfire.

Our decision in *People* v. *Robertson, supra*, 48 Cal.3d 18, is instructive. In that case, the defendant was found guilty of two murders and nine special circumstances (including rape, kidnapping, and torture) were found true. In addition, he had participated in "three prior acts of criminal violence involving threats of murder and mutilation and extraordinary physical abuse." (*Id.* at p. 56.) Balanced against these antisocial acts was mitigating evidence "that defendant is mildly mentally retarded, emotionally immature, suffers from personality disorders, has impaired judgment, and had a troubled childhood." (*Ibid.*)

Defendant proffered evidence that he would not pose a danger in the future. The trial court (the defendant had waived a jury) refused to consider the evidence, thereby committing *Skipper* error. We found the *Skipper* error harmless beyond a reasonable doubt, concluding the facts of the case, coupled with the evidence of prior criminal acts, clearly outweighed the other mitigating evidence. "[In light of] *the circumstances of the offenses,* including . . . defendant's pattern of violent sexual conduct, . . . we find the court's failure . . . to weigh in mitigation defendant's lack of future dangerousness could not have affected its penalty determination and is harmless beyond a reasonable doubt." (*Robertson, supra*, 48 Cal.3d at p. 57, italics added.) As in *Robertson, supra*, we find the circumstances of defendant's offense—five homicides—sufficiently serious that we conclude beyond a reasonable doubt that the exclusion of Wilson's testimony was harmless error.

Defendant contends that his case is distinguishable from those in which we have found *Skipper* error harmless, and argues his case is more like *Lucero, supra*, 44 Cal.3d 1006, where we found such error required reversal of the penalty phase judgment. (*Id.* at p. 1032.) He points out that he, like the defendant in *Lucero*, did not have any prior criminal convictions, the prosecution did not present any aggravating evidence other than the facts of the case, and that he was very young when he committed the crimes in question.

While these aspects of the *Lucero* case parallel the instant one to some extent, defendant fails to note the significant differences between the two cases. For example, the defendant in *Lucero* also presented a much stronger case in mitigation than did defendant: Lucero "offered a substantial showing in mitigation," including having suffered through "a deprived and harrowing childhood, a traumatic military experience, and a serious mental illness." (*Lucero*, *supra*, 44 Cal.3d at p. 1032; see also *id.* at pp. 1024-1026 [describing the mitigating evidence].) From the mitigating evidence presented at trial, it does not appear that defendant suffered through any similar types of personal setbacks or debilitating conditions. Moreover, while not to minimize the tragic deaths of the two children who were Lucero's victims, defendant killed *five* people, including one child of thirteen, and the carnage could have been much worse.

Moreover, the proposed evidence that defendant would make a good life prisoner was not particularly strong. In his offer of proof, Wilson testified that life prisoners assist in maintaining prison discipline by setting an example for the non-life prisoners, were generally respected by other prisoners, and had a high degree of rehabilitation. In explaining the basis for his conclusion that defendant would be one of these model prisoners if spared, Wilson explained that defendant wanted to live, he wanted to work with his hands, and showed an interest in education. None of these reasons seems particularly compelling; it is unclear, for example, why a desire to live or work with one's hands convinced Wilson that a prisoner confined for the rest of his life for five murders will reject a violent in-prison lifestyle.

Moreover, Wilson was seriously impeached on cross-examination. Although we have already detailed the substance of his cross-examination, it bears repeating that Wilson had been absent from the correctional system for nearly two decades, had not read the trial transcripts, and admitted that all he knew about the case (other than a brief interview with defendant) came from defendant's attorneys. In addition, Wilson had not been told defendant had threatened the life of an adverse witness. In short, Wilson was prepared to give a fairly general assessment of life prisoners as he knew them to be almost 20 years earlier, with only vague reasons why he thought defendant would be a productive and placid life prisoner.

In sum, after considering the strong aggravating evidence in the form of the circumstances of the offense, other mitigating evidence, and the strength of the improperly excluded evidence from Wilson, we conclude the *Skipper* error in this case was harmless beyond a reasonable doubt.

## 2. Expert Testimony of Detective Nunez

The evidence at trial showed many of the victims were killed while they stood on the sidewalk in front of Traci Berry's house. Bordering the sidewalk on the front of Berry's property was a fence about four and one-half feet high. On the other side of the sidewalk, several cars were parked in front of the house. During the guilt phase of the trial, the prosecution questioned Detective Nunez whether, based on his expertise, it appeared the victims on the sidewalk were "trapped." Defense counsel objected, arguing Nunez's answer would be an improper conclusion, speculation, beyond Nunez's expertise, and that the prosecution had not laid an adequate foundation qualifying Nunez as an expert in this area. The parties then conducted a voir dire of Detective Nunez out of the jury's presence and the trial court overruled the defense objections.

Once again before the jury, Detective Nunez testified that the combination of the fence and the parked cars created a "corridor . . . from which the victims had no route of escape. They were in essence trapped." During closing argument at the penalty phase of the trial, the prosecutor twice referred to Nunez's testimony. First, he noted that defendant was "a powerful man when he has a weapon, a powerful man when he's got that group of kids trapped in what you recall Detective Nunez referred to as a corridor of fire or . . . they were trapped between the fence and the cars . . . ." Later, the prosecutor argued the victims were "helpless" and, "going back to Detective Nunez'[s] description of the crime scene, these kids were trapped between the fence and the cars."

■ Defendant first contends Detective Nunez was not qualified to testify as an expert. As we noted, *ante*, at page 1115, an expert need only demonstrate he possesses "special knowledge, skill, experience, training or education sufficient" for the trial court to find him an expert. (*People v. Bloyd, supra*, 43 Cal.3d at p. 357; *People v. Kelly, supra*, 17 Cal.3d at p. 39.) Nunez's testimony amply demonstrates such education and training. He had extensive police and military training, including training in survival techniques, recognizing ambushes and escape situations, as well as having spoken with individuals who had "observed prison gang members practicing ambush techniques within prison yards and who . . . had experience with gangs who had planned and attempted to ambush police officers." Contrary to defendant's claim that such background does not qualify Nunez as an expert in what constitutes a "corridor," Nunez testified that "[a] corridor could be like any situation where you have two walls, whether the walls are actual buildings, whether the walls are high ground on both sides, whether the walls are rows of trees or rows of vehicles. That would very well be a

corridor." On balance, we conclude the trial court's decision qualifying Nunez as an expert was not a manifest abuse of discretion. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 971 [applying abuse of discretion standard]; *People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1299 [283 Cal.Rptr. 382, 312 P.2d 563] [same].)

Defendant next contends Nunez's testimony was not a proper subject for expert testimony because the jurors could have decided for themselves whether the victims were trapped between the fence and the parked cars. We disagree: " 'The jury need not be wholly ignorant of the subject matter of the [expert] opinion in order to justify its admission . . . . [Expert testimony] will be excluded only when it would add nothing at all to the jury's common fund of information . . . .' " (*People* v. *McAlpin, supra,* 53 Cal.3d at pp. 1299-1300, quoting *People* v. *McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) We conclude that Detective Nunez's expert testimony would have assisted the jury in integrating the photographic evidence of the crime scene with the evidence of where the victims fell and where shell casings were found. Accordingly, the trial court's decision to admit Nunez's testimony was not error.

Defendant argues that Nunez's testimony "left the jury with the impression that the victims were essentially sitting ducks and that [defendant] took advantage of that situation." This is not, of course, a ground for exclusion, but we nevertheless note that defense counsel cross-examined Nunez and elicited the fact that the cars on the street were not parked bumper to bumper. This implied there were gaps through which the victims could have tried to escape, thereby undermining Nunez's assertion that the victims were trapped. Defendant was also free to call his own expert to dispute Nunez's conclusion that the victims were "trapped." We therefore reject defendant's challenges to Detective Nunez's testimony.

### 3. *Exclusion of Polygraph Evidence*

Defendant next challenges the exclusion of evidence that he successfully passed a polygraph examination. According to defense counsel's offer of proof, defendant was examined shortly after his arrest by Herb Smith, then the chief polygraph examiner for the Los Angeles Police Department. Smith asked defendant four questions: "[1] did you know in fact that a shooting on 54th Street was going to happen? . . . [2] did you personally fire any of those shots yourself? . . . [3] at the time those people were shot on 54th Street that night[,] were you there . . . at the scene? . . . [4] do you know for sure who shot those people that night?" Defendant replied in the negative to all four questions. Smith would have testified that defendant was telling the truth.

Smith was available to testify for the defense but the prosecutor's objection, based on Evidence Code section 351.1, was sustained by the trial court. Defendant contends the excluded evidence was relevant mitigating evidence in two ways: it demonstrated his good character by showing he cooperated with police from the outset of the investigation, and it supports a lingering doubt of his guilt. He thus claims we must reverse the penalty judgment due to the exclusion of this evidence.

Evidence Code section 351.1 states that "the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take . . . or [the] taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including . . . post conviction . . . hearings, . . . unless all parties stipulate to the admission of such results." Defendant, recognizing the facial applicability of this statute, argues that barring him from presenting favorable mitigating polygraph evidence at the penalty phase violates his federal constitutional right to have the penalty phase jury consider all "relevant mitigating evidence." (*People* v. *Edwards* (1991) 54 Cal.3d 787, 837 [1 Cal.Rptr.2d 696, 819 P.2d 436] [hereafter *Edwards*]; *Skipper, supra,* 476 U.S. 1.) In support, he cites several cases in which the United States Supreme Court held the application of state evidentiary rules governing the admissibility of evidence was inconsistent with the federal constitutional right to due process, to compulsory process, and to testify on one's own behalf. (See *Rock* v. *Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704]; *Green* v. *Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] [hereafter *Green*]; *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038]; *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920].)

Defendant, however, failed to present an offer of proof that polygraph evidence was generally accepted in the scientific community. We have previously held that such an offer of proof is necessary to preserve the issue for appeal. (*People* v. *Morris* (1991) 53 Cal.3d 152, 193 [279 Cal.Rptr. 720, 807 P.2d 949].) " 'Absent an offer of proof that the polygraph is now accepted in the scientific community as a reliable technique, the evidence was presumptively unreliable and inadmissible.' Having failed to make the proper offer of proof, defendant is in no position to assign error in the trial court's ruling." (*Ibid.,* fn. omitted, quoting *People* v. *Harris* (1989) 47 Cal.3d 1047, 1094-1095 [255 Cal.Rptr. 352, 767 P.2d 619].)

Defendant argues he should be excused from having failed to make an offer of proof because a request to do so would have been futile. Assuming for argument that such a showing would have been futile, we note the United States Supreme Court has exercised caution in rejecting the application of

state evidentiary rules. In a case involving the right to testify, the court opined that "the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' . . . In applying its evidentiary rules, a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." (*Rock v. Arkansas, supra*, 483 U.S. at pp. 55-56 [97 L.Ed.2d at p. 49], fn. omitted.)

The issue was raised in an analogous posture in *Edwards, supra*, 54 Cal.3d 787. In *Edwards*, a capital defendant argued the exclusion of hearsay evidence at the penalty phase of his trial violated his right to federal due process. He cited *Green, supra*, 442 U.S. 95, in support.[11] After considering this case, we stated: " '*Green* held that a defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is "highly relevant to a critical issue in the punishment phase of the trial," and (2) there are substantial reasons to assume the reliability of the evidence.' (*People v. Kaurish* [(1990)] 52 Cal.3d [648,] 704 [276 Cal.Rptr 788, 802 P.2d 278], quoting Green, *supra*, at p. 97; . . .)" (*Edwards, supra*, 54 Cal.3d at pp. 837-838; see also *People v. Hawthorne, supra*, 4 Cal.4th at p. 59 [hearsay exceptions for prior inconsistent statement and prior recorded statement "do not create categorical or conclusive limitations on the admission of relevant evidence or impose unreasonable foundational requirements" and thus do not violate due process].)

Applying Edwards to this case, we find that—for interrelated reasons—the proffered evidence fails both prongs of the test. Thus, the evidence was not "highly relevant" to the question of the proper punishment because there was no showing the polygraph evidence was reliable. Without this threshold showing, it was properly excluded.

### 4. *Exclusion of Evidence Describing the Difference Between a Death Sentence and a Life Sentence*

As explained, *ante*, at page 1112 et seq., defendant proffered the testimony of Lawrence Wilson, a former warden of San Quentin, and Byron Eshelman, a former prison chaplain. Also ready to testify was Howard Brodie, a former news correspondent who had witnessed a state execution in 1967, and Aaron Owens, a former inmate who had been sentenced to a life term. These four

---

[11]In *Green*, a Georgia trial court, applying state evidentiary rules, excluded testimony from a defense witness who would have testified that a third party had confessed the crime to him. The United States Supreme Court concluded that preventing the witness from testifying violated the defendant's right to due process.

prospective witnesses would have testified to their knowledge of the administration of the gas chamber, the life led by prisoners on death row, and the life led by prisoners sentenced to a life term. Citing *People v. Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn. by Clark, J. (hereafter *Harris*), the trial court excluded testimony on these topics.

Defendant contends the trial court erred by excluding this evidence. Admitting that *Harris, supra,* 28 Cal.3d 935, and its progeny (see, e.g., *People v. Daniels* (1991) 52 Cal.3d 815, 878 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Whitt* (1990) 51 Cal.3d 620, 644-645 [274 Cal.Rptr. 252, 798 P.2d 849]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1265-1266 [270 Cal.Rptr. 451, 792 P.2d 251]; *People v. Grant, supra,* 45 Cal.3d at p. 860) support exclusion of this type of evidence, he nevertheless argues that *Harris* was not well considered and that both section 190.3 and federal law demand that this type of evidence be admitted at the penalty phase.

Although the point is earnestly and forcefully presented, we conclude defendant fails to present a persuasive reason to disapprove our previous position on this issue. It is true, as defendant argues, that the analysis in *Harris* comprised only a few sentences, but it is the content and not the brevity of the discussion that is important. ▮▮▮ We reiterate our belief that as "a matter of law, evidence explaining how capital punishment is carried out is not relevant to any issue material to the choice of penalty and as such is inadmissible. [Citations.] Such evidence has 'no bearing on the character or record of the individual offender or the circumstances of his particular offense, which are the proper focus of a penalty trial under *Woodson v. North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978]. A vivid account of an execution has no place at the penalty phase. Unlike mitigating evidence of a defendant's background and character, which may be introduced to elicit the sympathy or pity of the jury, accounts of the executions of others do not aid the jury in making an *individualized* assessment of the crucial issue whether the death penalty is appropriate for the particular defendant on trial.' " (*People v. Gordon, supra,* 50 Cal.3d at pp. 1265-1266, quoting *People v. Grant, supra,* 45 Cal.3d at p. 960, italics in Grant.) Accordingly, we decline defendant's invitation to overrule *Harris* and its progeny.[12]

### 5. *Overlap Between Factors (a) and (b)*

▮▮▮ The trial court read to the jury the 1986 version of CALJIC No. 8.84.1, the standard instruction outlining the various factors the jury should

---

[12]We note Reverend Eshelman's testimony was excluded in *People v. Daniels, supra,* 52 Cal.3d at page 878, but was admitted in *People v. Morris, supra,* 53 Cal.3d at page 219. Howard Brodie's proposed testimony was excluded in both *People v. Whitt, supra,* 51 Cal.3d at page 644, and in *Harris, supra,* 28 Cal.3d at page 962.

consider in determining whether to sentence defendant to life imprisonment without the possibility of parole, or death. Defendant now contends this instruction was faulty because it permitted the jury to "double count" the violent circumstances of the crimes that formed the basis of his five murder convictions. Thus, he claims the jury could have considered his crimes under both section 190.3, factor (a) (the circumstances of the offense) and factor (b) (the presence of criminal activity involving force or violence).

Section 190.3, factor (b) concerns crimes other than the ones for which the defendant is being tried (*People* v. *Melton* (1988) 44 Cal.3d 713, 763 [244 Cal.Rptr. 867, 750 P.2d 741]), and we have directed that future juries be so instructed (*People* v. *Montiel* (1993) 5 Cal.4th 877, 938 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [court should instruct the jury to clarify the difference between factors (a), (b), and (c)]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 106, fn. 28 [same]). The standard jury instruction on the issue, however, "does not inherently encourage 'double-counting' under section 190.3" (*People* v. *Pride* (1992) 3 Cal.4th 195, 269 [10 Cal.Rptr.2d 636, 833 P.2d 643]), and thus, "even if one or more jurors mistakenly consider a particular criminal incident under the wrong factor, there is little risk that a reasonable jury will give a single incident duplicative consideration." (*People* v. *Montiel, supra,* 5 Cal.4th at p. 939; *People* v. *Fauber* (1992) 2 Cal.4th 792, 858 [9 Cal.Rptr.2d 24, 831 P.2d 249].) To the extent that defendant is claiming the trial court should have clarified the standard instruction sua sponte, his claim fails.

Defendant argues the prosecutor's closing argument reveals he exploited a perceived ambiguity in the jury instruction describing the various factors. We have explained previously that " '[a]bsent improper argument, jurors are unlikely to give the circumstances of the current crime greater weight in the penalty determination simply because they appear to be included in two separate categories of statutory "aggravation." ' " (*Hardy, supra,* 2 Cal.4th at p. 205, quoting *People* v. *Melton, supra,* 44 Cal.3d at p. 763.) The prosecutor here remarked: "I'd like at this time to go through some of the other factors with you. [¶] [Factor] b, the presence or absence of criminal activity by the defendant which involves the use or attempted use of force or violence. [¶] You only have and [*sic*] the only evidence presented to you are the facts in the guilt phase. [¶] A lot of violence in that." It thus appears the prosecutor urged the jury to consider the facts of the crimes under both factors (a) and (b).

The People contend any challenge to the prosecutor's argument was waived by defendant's failure to timely object. (See *People* v. *Daniels, supra,* 52 Cal.3d at pp. 890-891.) We need not resolve that point because,

even assuming defendant preserved the issue, we agree with the People's further argument that any error was harmless. The prosecutor's comment was very brief and he did not invite consideration of any facts that were not already before the jury. (*People* v. *Clark* (1992) 3 Cal.4th 41, 168 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Indeed, the jury's consideration of the facts and circumstances of the crimes was proper under factor (a). The pertinent inquiry, then, is whether the there is a reasonable possibility that the failure to clarify the scope of factor (b) could have affected the outcome of the trial. (*Hardy, supra,* 2 Cal.4th at p. 205; see *People* v. *Brown* (1988) 46 Cal.3d 432, 447-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Given the brevity of the offending comment, and the absence of any improperly admitted evidence, we find there is no reasonable possibility the error affected the outcome of the trial.

### 6. *Absence of Mitigation as an Aggravating Factor*

■ Defendant next claims that because the jury instructions did not inform the jury which factors were mitigating and which were aggravating, a reasonable jury would have construed the instructions to permit finding the absence of a mitigating factor as a circumstance in aggravation.[13] We find nothing ambiguous in the jury instruction. The jury was instructed to consider a list of factors "if applicable" and that admonition was repeated later when the jury was told to "take into account and be guided by the applicable factors. . . ." (See *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1326 [18 Cal.Rptr.2d 796, 850 P.2d 1].) We assume the jury followed these instructions and determined that mitigating factors for which there was no evidence were simply not "applicable."

Defendant further argues that the instruction's failure to identify which factors could be considered aggravating and which were mitigating led to a sentence that was based on irrelevant considerations (in violation of his due process rights), and was arbitrary and capricious (in violation of his rights under the Eighth Amendment). (See *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130].) We recently rejected this precise contention, explaining that "certain of the factors can only be mitigating (e.g., factors (d), (e), (f), (g), (h), and (k)), and we have further concluded that the mitigating nature of these factors is clear even in the face of contrary argument. [Citation.] The aggravating nature of certain others (e.g., factors (b) ['other' violent criminal activity], (c) [prior felony convictions]) is

---

[13]Defendant does not argue that the prosecutor committed *Davenport* error, that is, that *his argument* invited the jury to consider the absence of mitigation as an aggravating circumstance. (See *People* v. *Clark* (1993) 5 Cal.4th 950, 1030 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].)

equally apparent. Still other factors may allow either aggravating or mitigating consideration, depending on the particular circumstances. However, so long as they focus the sentencer's consideration on 'specific, provable, and commonly understandable facts' that properly bear on the appropriate penalty, they cannot be deemed unconstitutionally vague 'simply because they leave the sentencer free to evaluate the evidence in accordance with his or her own subjective values.' [Citation.]" (*People* v. *Montiel, supra*, 5 Cal.4th at pp. 944-945.) We adhere to this reasoning and reject defendant's due process and Eighth Amendment arguments. (See also, *People* v. *Clark, supra*, 5 Cal.4th at p. 1040; *People* v. *Raley* (1992) 2 Cal.4th 870, 919 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

### 7. Other Claims

Defendant next contends his rights to a fair trial, due process, equal protection of the laws, and a reliable death judgment pursuant to the Eighth Amendment were violated because the jury was not instructed that the following must be proved beyond a reasonable doubt: (a) that aggravating factors existed; (b) that these factors substantially outweighed the mitigating ones; and (c) that death was the appropriate penalty. We have repeatedly rejected these claims (see, e.g., *People* v. *Clark, supra*, 5 Cal.4th at p. 1040; *People* v. *Pride, supra*, 3 Cal.3d at p. 268; *People* v. *Clark, supra*, 3 Cal.4th at p. 170; *Hardy, supra*, 2 Cal.4th at p. 214), and are not persuaded to reconsider our views concerning those issues.

 Defendant further argues the absence of a requirement that the jury return a written statement of reasons renders its decision constitutionally suspect under the Fifth and Fourteenth Amendments (due process), and the Eighth Amendment (cruel and unusual punishment). We disagree. (See, e.g., *People* v. *Fauber, supra*, 2 Cal.4th at p. 859.) We also decline defendant's invitation to require a written decision of the jury pursuant to our power to declare rules of criminal procedures. (See, e.g., *People* v. *Martin* (1986) 42 Cal.3d 437, 449 [229 Cal.Rptr. 131, 722 P.2d 905] [courts have "inherent power to require a statement of reasons as a judicially declared rule of criminal procedure"].)

### 8. Consideration of Probation Report

 Finally, defendant contends he is entitled to a remand to permit renewed consideration of his section 190.4, subdivision (e), motion for modification of the verdict because the trial court erroneously considered the probation report when ruling on the motion. Because the trial court, when ruling on a section 190.4 motion, is limited to a consideration of the

evidence presented to the jury, consideration of a probation report is error. (*People* v. *Brown* (1993) 6 Cal.4th 322, 337 [24 Cal.Rptr.2d 710, 862 P.2d 710]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].)

In this case, the trial judge signed the probation report under the phrase, "I have read and considered the foregoing report of the probation officer." In addition, when ruling on a motion for a new trial as well as the automatic motion for modification under section 190.4, subdivision (e), the court stated it had read the probation report. There was potential prejudice in this misstep, for the probation report contained victim impact evidence that was not presented to the jury, as well as a description of several juvenile and adult arrests for auto theft, assault, battery, vandalism, and other various activities apparently associated with defendant's affiliation with a street gang. These alleged crimes all occurred in the months just preceding the murders in this case and none of them was presented to the jury.

Nevertheless, we cannot conclude the potential for prejudice was realized. When stating its reasons for denying modification, the trial court did not once mention any of the information in the probation report that was not otherwise presented to the jury. The court emphasized "the carnage of innocent and defenseless human beings," and noted that "it is difficult to conceive circumstances that would demonstrate a more callous indifference to human life than is shown by the wanton and willful multiple murders in this case." The court then assessed most of the factors in section 190.3, never mentioning the information in the probation report. Significantly, the court opined that defendant lacked any prior felony convictions, a mitigating circumstance. As we concluded in *People* v. *Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965], "[u]nder these circumstances, we cannot say that there is a reasonable possibility that the court's improper consideration of the probation report affected its section 190.4(e) ruling." (*Id.* at p. 1202, also quoted in *People* v. *Brown*, *supra*, 6 Cal.4th at p. 338.)

CONCLUSION

The judgments as to both guilt and penalty are affirmed.

Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment of guilt and death eligibility, but dissent from the judgment of death.

As to guilt and death eligibility, I have found no error or other defect that requires reversal. In my view, however, the trial court clearly erred by

excluding as inadmissible hearsay what was in fact not hearsay at all. I will not merely "assum[e]" that it did. (Maj. opn., *ante*, at p. 1103.) Such out-of-court statements as defendant sought to elicit were not hearsay because they were not "offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) The question of prejudice is somewhat close. "The evidence against defendant fell largely, although not exclusively, into two major groups: eyewitness identification and inmate informant evidence." (Maj. opn., *ante*, at p. 1101.) The latter cannot be deemed "overwhelming"— certainly not if we consider the source. But neither can the former. Even though "they were familiar with" him, "some of the witnesses did not initially identify defendant as the shooter . . . ." (*Id.* at p. 1111, fn. 9.) Nevertheless, in light of the evidence in its entirety, including especially defendant's jail cell graffiti "confession," I simply cannot conclude there is a reasonable probability that the error affected the outcome. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

As to death, however, the matter is different. In violation of the Eighth Amendment to the United States Constitution, the trial court erroneously excluded the testimony of Warden Lawrence Wilson and Chaplain Byron Eshelman. Like Justice Kennard, whose concurring and dissenting opinion I join, "I cannot conclude, *beyond a reasonable doubt*, that the jury's verdict was unaffected by the trial court's erroneous exclusion of that testimony." (Dis. opn. of Kennard, J., *post*, at p. 1135, italics in original].)

Accordingly, I would reverse the judgment of death.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority's affirmance of defendant's convictions for five counts of murder and a multiple-murder special circumstance. But I cannot join the majority in affirming the sentence of death.

The United States Supreme Court has held that the Eighth Amendment entitles a capital defendant, irrespective of the heinous nature of the crime or crimes committed, to offer evidence that if spared execution, but incarcerated, the defendant would not pose a danger to the community. "[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentence determination." (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 7 [90 L.Ed.2d 1, 8, 106 S.Ct. 1669].)

At the penalty phase of this capital case, the defense proffered two expert witnesses—a former warden and a prison chaplain—who were prepared to testify that prisoners sentenced to life imprisonment without possibility of

parole generally are model prisoners and conform to prison rules, and that defendant, if given such a sentence, would adjust well to the prison environment. The majority concedes that the trial court erred in not allowing this testimony. It concludes, however, that the error was harmless. I disagree.

In assessing prejudice, the critical inquiry is whether we, as a reviewing court, can conclude *beyond a reasonable doubt* that the excluded evidence would not have affected the jury's verdict of death. Because I cannot say with the required degree of confidence that the jury, had it been permitted to hear the erroneously excluded evidence, would nevertheless have concluded that defendant should be executed, I would reverse the judgment of death.

I

At the guilt phase of defendant's capital trial, the prosecution presented evidence that defendant and a fellow gang member went to a party attended by members of a rival gang, drew guns, and opened fire. The jury convicted defendant of five counts of murder. It also found true a multiple-murder special-circumstance allegation, which rendered defendant eligible for the death penalty. (Pen. Code, § 190.2, subd. (a)(3).) Defendant was 18 years old and had no prior history of violence.

At the penalty phase, defendant called as a witness Lawrence Wilson, a retired prison warden. Wilson stated that he had served with the California Department of Corrections for 26 years, from 1944 to 1970, during which time he held positions as Deputy Warden at Folsom state prison, Warden of Soledad and San Quentin prisons, and Deputy Director of the Department of Corrections in Sacramento. At this juncture, the prosecutor, in a side-bench conference, questioned whether Wilson could offer relevant evidence. He asked the trial court to direct the defense to provide an offer of proof regarding the nature of Wilson's proposed testimony. A lengthy discussion ensued between the court and both counsel, out of the jury's presence.

The trial court first ruled, correctly, that Warden Wilson could not testify about the manner in which executions are carried out. The parties then debated whether Wilson could testify about defendant's likely behavior while serving a sentence of life imprisonment without possibility of parole. The trial court asked defense counsel for a detailed offer of proof on this issue, and permitted him to make the requisite showing by having Wilson testify.

Outside the jury's presence, Warden Wilson gave this testimony: Unlike prisoners sentenced to death, who are segregated from the remainder of the

prison population, those serving life sentences are housed in the "mainline" with other inmates. In Wilson's experience, prisoners serving life sentences are unlikely to have disciplinary problems, are relied on by prison officials to control the other inmates, and often have a positive influence on prisoners who are not serving life terms. After talking to defendant for nearly an hour, Wilson concluded that defendant would adjust well as a life prisoner. Wilson knew that defendant had been a gang member, and that gangs were active in prison, but in his view defendant appeared genuine in his desire to disassociate himself from gang-related activity.

On cross-examination by the prosecution, Warden Wilson acknowledged that since his retirement, which occurred 17 years before the trial in this case, California prisons had "changed." The prosecutor, however, did not ask Wilson to describe those changes. Wilson also acknowledged that only some of the life prisoners he had observed during his tenure were serving sentences that precluded all possibility of parole. The others, by contrast, were eligible for parole, and therefore had an incentive to show the parole board that they were appropriate candidates for release; defendant, if sentenced to life without the possibility of parole, would not have this incentive. The prosecutor then asked Wilson if his belief that defendant would make a good life prisoner would be affected if he knew that defendant had threatened a witness while in jail awaiting trial. Wilson replied that he did not know of the threat, but that any such threat would not alter his opinion.

In the course of making the offer of proof, defense counsel represented to the trial court that Byron Eshelman, a retired prison chaplain, would, if called as a witness, offer testimony similar to Warden Wilson's.

The trial court refused to permit Warden Wilson and Chaplain Eshelman to testify on defendant's behalf, finding that their proposed testimony was irrelevant, lacked an adequate foundation, and would "usurp[] the jury's function and invade[] the province of the jury." Following this ruling, the defense called defendant's mother and his grandmother as witnesses at the penalty phase. In the presence of the jury, they briefly described the schools defendant had attended and the relatives with whom he had lived. They said that defendant believed in God and was protective of his mother, and that they loved him. They asked the jury to spare defendant's life.

The prosecution offered no evidence at the penalty phase.

## II

The majority concedes that the trial court erred in not allowing Warden Wilson and Chaplain Eshelman to testify on behalf of defendant at the

penalty phase. Under the Eighth Amendment to the federal Constitution, the trier of fact must be permitted to consider in mitigation, at the penalty phase of a capital case, " 'any aspect of a defendant's character . . . that the defendant proffers as a basis for a sentence less than death.' " (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869].) This court explained recently: "[C]onsideration by the sentencer of any mitigating aspect of ' "the character and record of the individual offender and the circumstances of the particular offense" ' is ' "a constitutionally indispensable part of the process of inflicting the penalty of death." ' " (*People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 466 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

Evidence that the defendant, if given a sentence less than death, will not pose a danger to others, is a form of character evidence that falls within this rule. In the words of the United States Supreme Court in *Skipper* v. *South Carolina, supra,* 476 U.S. at page 5 [90 L.Ed.2d at page 7]: "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. . . . [S]uch evidence may not be excluded from the sentencer's consideration."

Here, in precluding the jury from hearing testimony by Warden Wilson and Chaplain Eshelman that defendant was likely to be a good prisoner if sentenced to life imprisonment without possibility of parole, the trial court violated defendant's constitutional right to offer potentially mitigating evidence. (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 5 [90 L.Ed.2d at p. 7]; see also *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1026-1029 [245 Cal.Rptr. 185, 750 P.2d 1342] [trial court's exclusion of expert prediction that the defendant would adjust well in a prison setting was prejudicial error].)

Was the error prejudicial? The majority concludes it was harmless. I do not share that view.

In *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], the high court stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at pp. 710-711].) When, as here, the violation of the federal Constitution occurs at the penalty phase of a capital trial, a reviewing court must proceed with particular caution. (*People* v. *Haskett* (1990) 52 Cal.3d 210, 253 [276 Cal.Rptr. 80, 801 P.2d 323] (dis. opn. of Mosk, J.); see *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 258 [100 L.Ed.2d 284, 295, 108 S.Ct. 1792] ["the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to

the sentencer"].) In evaluating the effect of the error, the reviewing court does not consider whether a judgment of death would have been rendered in a hypothetical trial in which the error did not occur; rather, it must decide whether the death sentence in *this* trial was "surely unattributable to the error." (*Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d 182, 189, 113 S.Ct. 2078, 2081].)

In this case, the jury deliberated for five days before reaching its penalty verdict. The explanation for these protracted penalty deliberations cannot be found in the volume of evidence the jury was required to review and evaluate, for the prosecution presented no evidence at the penalty phase and the testimony of the two defense witnesses was brief. Thus, reviewing the relevant evidence was a relatively simple chore. A more plausible explanation for the length of the penalty deliberations—indeed the only plausible explanation—is that the jury found the selection of the appropriate penalty in this case to be a close and difficult issue.

Although the killing of five people must have weighed heavily in favor of the ultimate penalty of death, other considerations favored the less extreme penalty of life imprisonment without possibility of parole. One such consideration was defendant's youth. He committed the murders five months after his eighteenth birthday; thus, he would have been ineligible for the death penalty had he been just five months younger (Pen. Code, § 190.5).[1] Another consideration weighing against the death penalty was defendant's prior criminal record or, more precisely, the lack thereof. Had defendant been previously convicted of any felony, or had he committed any previous criminal act of violence, the prosecution could have offered evidence of the conviction or act as a circumstance in aggravation. (Pen. Code, § 190.3, factors (b), (c).) Because the prosecution made no such showing, the jury was required to conclude that the capital murders were defendant's first criminal acts of violence and resulted in his first felony conviction.

According to the majority, the trial court's erroneous refusal to permit Warden Wilson and Chaplain Eshelman to testify was harmless in view of the nature of defendant's offense—the murder of five persons, including a thirteen-year-old child—which the majority characterizes as "powerful aggravating evidence." (Maj. opn., *ante*, p. 1118.) But the evidence of defendant's guilt was not overwhelming. In a previous trial of these murders, the

---

[1]Under the law in effect when defendant committed the killings, murderers under the age of 18 could not even be sentenced to life without possibility of parole. (*People* v. *Spears* (1983) 33 Cal.3d 279, 283 [188 Cal.Rptr. 454, 655 P.2d 1289].) Under current law, a defendant who commits a murder with special circumstances before turning 18 still may not be sentenced to death, but may be sentenced to life imprisonment without possibility of parole. (Pen. Code, § 190.5.)

jury was unable to reach a verdict as to defendant's guilt; his codefendant, tried by a separate jury, was acquitted. In this case, the jurors deciding penalty may well have harbored some lingering doubts that defendant was one of the gunmen who committed these murders; under our law, they were entitled to consider these doubts at the penalty phase of trial. (*People* v. *Johnson* (1992) 3 Cal.4th 1183, 1252 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Cox* (1991) 53 Cal.3d 618, 677-678 [280 Cal.Rptr. 692, 809 P.2d 351].)

The majority suggests that the facts of this case are similar to those of *People* v. *Robertson* (1989) 48 Cal.3d 18 [255 Cal.Rptr. 631, 767 P.2d 1109]. Not so. In *Robertson*, the defendant contended that the trial court, sitting without a jury as trier of fact at the penalty phase of a capital case, had erroneously refused to consider evidence that the defendant would not pose a future danger to the community or to other inmates. We rejected this contention, holding that the trial court had *properly considered* the evidence, and thus committed no error. We further concluded in *Robertson* that even assuming the trial court had not considered the evidence, any error was harmless in light of the overwhelming aggravating circumstances.

Here the majority asserts that because in *People* v. *Robertson, supra,* 48 Cal.3d 18, we found any error to be harmless in light of the strong evidence in aggravation, we must do the same here. This assertion is analytically flawed in two respects. First, because we held that the trial court in *Robertson* committed no error, our discussion of the prejudicial effect of an error that did *not* occur was mere dictum. Second, and more important, the facts of *Robertson* and the facts of this case are completely different. Unlike the situation here, the murders in *Robertson* exhibited an extreme degree of sadism and cruelty.[2] Also, Robertson was in his mid-30's, and had a long history of torturing and sexually assaulting both men and women. By contrast, here defendant was 18 years old when he committed the murders, and he had no prior history of violence.

The proposed testimony of Warden Wilson and Chaplain Eshelman formed a major part of defendant's intended case in mitigation at the penalty phase. Because defendant was only 18 years old when he committed the murders, he would be incarcerated for many decades if sentenced to life without the possibility of parole. Defendant's need to reassure the jury that he would not pose a danger to others during his long incarceration was

---

[2] In *People* v. *Robertson, supra,* 48 Cal.3d 18, the defendant kidnapped, raped, tortured, and murdered two women, in unrelated incidents a week and a half apart. The trial court concluded, based on " 'the extreme mutilation of the bodies before and after death,' " that the defendant obtained gratification from inflicting pain on his victims. (*Id.* at p. 56.)

therefore critical. When the trial court excluded the testimony of Warden Wilson and Chaplain Eshelman, it deprived the defense of the opportunity to provide that reassurance. The court's ruling left defendant with only two witnesses, his mother and grandmother, who testified briefly about his childhood but could offer the jury no enlightenment regarding defendant's future dangerousness. Thus, by precluding defendant from introducing the testimony of Wilson and Eshelman, the trial court did more than simply deny him the opportunity to add inessential details to an otherwise thorough penalty presentation. Rather, by denying defendant the chance to present penalty phase witnesses whose testimony was vital, the trial court gutted his case in mitigation.

Although, as I pointed out earlier, the parties offered little evidence at the penalty phase, the jury struggled long and hard with the decision whether to sentence defendant to death. Had defendant been permitted to offer expert testimony by Warden Wilson and Chaplain Eshelman that he was likely to behave well in a prison setting, the jury might well have been persuaded to spare his life. Therefore, I cannot conclude, *beyond a reasonable doubt*, that the jury's verdict was unaffected by the trial court's erroneous exclusion of that testimony. "In such circumstances, we must put aside any personal beliefs as to the propriety of the penalty of death, and allow the jury to make its own decision based on all the evidence . . . ." (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 219 [19 Cal.Rptr.2d 836, 852 P.2d 331] (dis. opn. of Kennard, J.).)

For these reasons, I would reverse the judgment of death.

Mosk, J., and Kremer, J.,* concurred.

Appellant's petition for a rehearing was denied August 24, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*Presiding Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Acting Chairperson of the Judicial Council.