Filed 3/9/22  P. v. Prince CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C093531 |
| Plaintiff and Respondent, | (Super. Ct. No. 19CF04016) |
| v. | |
| DAVID SWANK PRINCE, | |
| Defendant and Appellant. | |

Defendant David Swank Prince threw a rock at Thomas S., striking him in the head.  A jury found defendant guilty of assault with a deadly weapon.

On appeal, defendant asserts the trial court committed prejudicial evidentiary error in precluding him from presenting a responding deputy's body camera footage or, alternatively, a defense investigator's testimony describing that footage.  Defendant also asserts the court abused its discretion in preventing him from recalling Thomas to examine him about that footage.  Under a separate heading, defendant asserts the same evidentiary rulings violated his constitutional right to present a defense.

1

We conclude that any error in precluding the subject evidence was harmless. We further conclude the trial court's evidentiary rulings did not violate defendant's constitutional right to present a defense.

We affirm.

## BACKGROUND

A felony complaint deemed information charged defendant with assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1).) Defendant executed a *Faretta*[1] waiver and the trial court granted defendant's request to represent himself.

### *The Prosecution Case*[2]

Carolyn R. lived in Berry Creek in Butte County. Thomas, Carolyn's friend, lived on the property in a converted loft apartment over the garage. He helped Carolyn around the property in a handyman capacity.

Carolyn knew defendant for about three years before he moved away to Modesto. When defendant moved back to the area, he was "completely different." When he was younger, he was very thoughtful; when he returned from Modesto, he was sullen, argumentative, and "not very nice."

On June 23, 2019, defendant came to Carolyn's door. He was "very upset over nothing." He swore at and threatened Carolyn. She asked him to leave, but he would not.

Meanwhile, Thomas, who had been in the garage nearby with a friend, followed defendant to Carolyn's house. Thomas could hear defendant cursing at Carolyn. Thomas attempted to escort defendant off the property, though he did not touch defendant physically. Thomas and his friend escorted defendant to an area near the front of the

---

[1]     *Faretta v. California* (1975) 422 U.S. 806.

[2]     The defense presented no evidence.

house, at which time defendant became "verbally aggressive" and told Thomas he was going to "kick [his] ass."

Defendant, who was about three feet away from Thomas, reached into his pocket, pulled out a rock, and threw it at Thomas. He then threw a second rock which struck Thomas in the back of the head. The rock was about the size of a playing card and three-quarters of an inch to an inch thick. Thomas's "head was split" and he required stitches.

After being hit with the rock, Thomas grabbed defendant and, with his friend's help, wrestled defendant to the ground. Thomas hit defendant once or twice while he was down. However, he never touched or threatened defendant before defendant threw the rocks at him. Thomas let defendant up and he left.

On cross-examination, defendant asked Carolyn if she saw Thomas and someone else attack defendant, and Carolyn responded: "They did not attack you . . . . You attacked them."

Carolyn testified she had cameras around her house. Asked if they were "backed up with an online database," Carolyn responded that Thomas "can probably bring them up. I can't. I just watched the security thing." Thomas testified on cross-examination there were cameras all around the property.

Deputy Sean Brandow responded to Carolyn's property. Brandow spoke with Carolyn, Thomas, and Thomas's friend, and he photographed Thomas's head wound. Brandow then apprehended defendant. Brandow took photographs of defendant at the jail. The photographs, admitted at trial, showed defendant sustained several scratches, had some redness on his skin, and had a cut over his right eye. Brandow testified defendant's wounds were more consistent with wrestling than a fistfight.

On cross-examination, Deputy Brandow testified he did not watch any security camera footage during his investigation, although he did see cameras around the property. When defendant asked why Brandow did not watch any footage, he responded: "They told me the camera that would have caught the incident was broken." Defendant asked,

3

"[s]o there wasn't any reason to check," to which Brandow responded: "Not based on their statements, no."

Deputy Brandow did not recall whether there was a live video feed from the security cameras on a screen inside the house. On redirect, Brandow testified he had seen the camera near where the incident occurred, and that Carolyn or Thomas told him the camera "died several days prior to the incident."[3]

## Verdict and Sentence

The jury found defendant guilty of assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1).) The trial court sentenced defendant to the low term of two years.

## DISCUSSION

## I

## Additional Background

In pretrial discovery, defendant requested all body camera footage and all of Carolyn's security camera footage. After Thomas's testimony, defendant, with his investigator, Evie Joseph, reviewed Deputy Brandow's body camera video, which had recently been provided to them. Defendant asked to play the footage for the jury. He also stated he wished to call Brandow and possibly Carolyn and Thomas in his defense case. The prosecutor objected to introduction of the body camera footage on hearsay and foundation grounds and pursuant to Evidence Code section 352.[4]

Asked for an offer of proof as to Thomas's proposed testimony, defendant responded, "the body cam video is going to show contradicting statements on the day of

---

[3]    Defendant asserts Thomas lied in stating the camera was broken. Thomas did not testify a camera was broken. Based on our reading of the record, it is not clear whether it was Thomas or Carolyn who allegedly told Deputy Brandow the camera was not working.

[4]    Further undesignated statutory references are to the Evidence Code.

4

and the very fact that there was security camera footage that was not collected. And there has been multiple different stories of a camera broken, but in that video you can see that the security system is working in perfect order." The court asked how body camera footage could establish whether a surveillance camera was functioning properly. Defendant replied: "You can see the live video on to TV scene [*sic*]. . . . There's cameras in working order . . . ." Defendant continued: "[Y]ou can see the cameras in perfect working order with the people walking around outside. And the state failed to collect this evidence, and it is being withheld."

The court excluded the body camera footage as irrelevant, based on foundational issues, and on hearsay grounds. Defendant stated that, without the body camera evidence, there was no need to recall Thomas.

After the prosecution presented its case-in-chief, defendant sought to call defense investigator Joseph to testify as to what she saw on the body camera video. Defendant stated, "it will . . . show video security camera live feed on the TV screen and the cameras were in working order and that the officer failed to collect and preserve evidence vital to my defense." The prosecutor objected on foundation and section 352 grounds.

Investigator Joseph testified at a section 402 hearing that, on the body camera video, in Carolyn's living room, she saw what "could be a TV screen or it could be a large monitor for a computer." "The easiest way for me to describe this is if you're at a convenience store and you see the monitor there and it's playing multiple videos of different areas that are on some sort of camera. That appeared to me what was playing when I saw this TV screen." On cross-examination, Joseph testified the screen could have been a television or a computer monitor. The prosecutor asked if it could have been a mirror and Joseph responded: "It could be. It could very well be a mirror, but it has -- it has some sort of" border around it. On redirect examination, she testified: "[I]t doesn't appear to be a television, but it's just some sort of shot footage that is playing. I mean, quite honestly it could be. It could be a television program that is playing that. But if I

was describing that to the best of my ability, it would be like a convenience store monitor where you see the different monitors."

The trial court concluded there was no reason for investigator Joseph to testify. She was not a percipient witness and had not been at the scene. The court also stated the fact that there was a screen displaying surveillance footage was not in dispute, as Carolyn and Thomas both testified there were surveillance cameras on Carolyn's property. The court continued: "Even if the monitors that are displayed in the body cam footage are, in fact, a TV screen or monitor that is displaying surveillance footage, that doesn't necessarily mean that that is surveillance footage that was somehow preserved or recorded. [¶] Certainly cameras are capable of capturing footage and displaying it on the screen. But if there's some type of a problem with the recording or there's no memory card or hard drive for that footage to be recorded on to, then there would be no way for the investigating officers to recover that to turn it over to the prosecution or to turn it over to the defense. [¶] So for those reasons . . . the Court is going to exclude [investigator] Joseph as well." Defendant asserted, "there should be a record of it" because Thomas testified "it is recorded on a database." The court replied: "But again, Sir, if something isn't working properly with that device, then that doesn't necessarily mean that there's a recording. Or if you want to argue that law enforcement could have tried to collect that evidence. There is nothing prohibiting you from arguing that. That is already before the jury. It's already been testified to by the witnesses in this case."

II

*Preclusion of the Body Camera Evidence and Prejudice*

Defendant asserts the trial court prejudicially abused its discretion in excluding Deputy Brandow's body camera footage. Defendant asserts that evidence of a monitor displaying video from surveillance cameras was relevant to the credibility of Thomas and Brandow. Defendant also asserts the trial court's preclusion of the evidence over foundation and hearsay concerns was an abuse of discretion. For the same reasons he

6

asserts the body camera footage was relevant, defendant asserts the trial court abused its discretion in precluding defense investigator Joseph's testimony about what she observed on the body camera video. Defendant further asserts the court abused its discretion in denying his request to recall Thomas to view and testify about the body camera footage.

Whether the trial court abused its discretion in precluding this evidence based on relevance (see §§ 210, 350) presents a close issue. In any event, it is one we ultimately need not decide. We conclude that any error in the preclusion of this evidence did not prejudice defendant.[5]

Defendant asserts that the error in precluding the evidence was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id*. at pp. 835-836; accord, *People v. Beltran* (2013) 56 Cal.4th 935, 955.) The *Watson* test " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, at p. 956.)

The evidence established that defendant came to Carolyn's door, swearing at her and threatening her. She asked him to leave, but he would not. Thomas followed

---

[5]    In light of our analysis, we need not address the bases, other than relevance, for the trial court's preclusion of the subject evidence.

For purposes of this discussion, we shall address the body camera footage itself rather than defense investigator Joseph's testimony about that footage. The result would be the same as to Joseph's proposed testimony.

defendant to Carolyn's house and attempted to escort defendant off Carolyn's property, although he did not touch defendant. Defendant became verbally aggressive and told Thomas he was going to "kick [his] ass." Defendant threw a rock at Thomas, which struck him in the back of the head. Thomas's "head was split" and he required stitches. Thomas denied touching or threatening defendant before defendant threw the rocks at him. Afterward, defendant had scratches and red marks consistent with wrestling injuries, consistent also with Thomas's account of wrestling defendant to the ground after defendant struck Thomas with the rock.

There were surveillance cameras throughout Carolyn's property. However, when Deputy Brandow investigated the incident, either Carolyn or Thomas told him "the camera that would have caught the incident was broken," and that the camera had "died several days prior to the incident."

Against this backdrop, Deputy Brandow's body camera footage would have established, at most, that a monitor in Carolyn's house displayed video feeds from surveillance cameras around her property. The evidence could have contradicted Carolyn's or Thomas's purported representation to Brandow that the camera in the vicinity of where the incident occurred was broken. Theoretically, this evidence could have suggested Thomas or Carolyn had lied about the camera being broken, a premise that could have been tested further had defendant been permitted to recall Thomas. Conversely, the evidence may have supported the representation that the camera was broken.

Taking all of the foregoing into consideration, we conclude it is not reasonably probable defendant would have achieved a more favorable result had the trial court admitted the body camera footage and permitted defendant to recall Thomas. (*Watson, supra*, 46 Cal.2d at p. 836.) Even assuming the body camera video showed a feed on a monitor in Carolyn's house from a camera in the vicinity where the incident occurred, this would not establish that the surveillance camera was recording, that the recording

8

was being preserved, or that the recording was available for review and collection by law enforcement. It would not show that law enforcement failed to collect relevant evidence in the course of the investigation. The evidence would not establish that the past events were not as described by Carolyn and Thomas, that Thomas and Carolyn were lying in their descriptions of those events, or that Thomas was the initial aggressor. Additionally, presented with such evidence, the jury could conclude Thomas or Carolyn was simply mistaken in stating the camera was broken. Or the jury may have concluded this representation was meant to indicate the feed from the camera was not properly recording rather than that the camera itself was broken.

Moreover, defendant in his cross-examination of both Thomas and Deputy Brandow confirmed there were cameras all around the property. Defendant cross-examined Brandow on why he did not view or collect surveillance camera video evidence. Defendant also pressed Brandow more than once about whether he remembered seeing a monitor in Carolyn's home displaying surveillance video. Additionally, defendant argued in closing that Brandow did not follow proper police procedure in processing the scene and collecting evidence and emphasized that reliable evidence in the form of the surveillance camera footage was absent.

Even if the jury, presented with the body camera evidence, concluded Thomas or Carolyn lied in representing to Deputy Brandow that the camera was broken, considered in light of all the other evidence, we cannot conclude it is reasonably probable defendant would have achieved a more favorable result. (*Watson, supra*, 46 Cal.2d at p. 836.) The evidence supporting the existing judgment, including Carolyn's and Thomas's testimony and Thomas's injury, is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, there is no reasonable probability any error in excluding the body camera video and Thomas's defense testimony affected the result. (See *People v. Beltran, supra*, 56 Cal.4th at p. 956.)

9

## III

### *The Constitutional Right to Present a Defense*

Defendant asserts the trial court's evidentiary rulings violated his constitutional right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi* [(1973) 410 U.S. 284, 302], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.)

"An appellate contention that the erroneous admission or exclusion of evidence violated a constitutional right is not preserved in the absence of an objection on that ground below." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10, citing §§ 353, 354.) "By failing to object below, defendant forfeited his claim that the exclusion of this evidence violated his constitutional rights . . . ." (*Daniels*, at p. 320, fn. 10; accord, *People v. Riggs* (2008) 44 Cal.4th 248, 292 [to the extent defendant raises a federal constitutional claim distinct from his claim that the trial court abused its discretion under the Evidence Code, he forfeited that claim by failing to identify that ground in his objections to the trial court].)

Defendant asserts he did not forfeit his contention because "the asserted error . . . had the additional legal consequence of violating due process." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Even assuming defendant may avoid forfeiture, we conclude there was no constitutional violation. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to [the] level [of a due process violation], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant]

to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in [*Watson, supra*, 46 Cal.2d at page 836], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) We reach the same conclusions here.

Defendant overstates the magnitude of the trial court's evidentiary rulings in claiming they "gutted [his] defense that [Thomas] was lying and that Brandow was biased against him and/or conducted a deficient investigation." (Fn. omitted.) The exclusion of the evidence did not prevent defendant from presenting a defense, but only from presenting evidence relevant to a minor or subsidiary point. (*People v. Fudge, supra*, 7 Cal.4th at p. 1103.) And we have already concluded, *ante*, that, under *Watson*, defendant was not prejudiced by the exclusion of the evidence.

DISPOSITION

The judgment is affirmed.

/s/                   <br>HOCH, J.

We concur:

/s/                   
RAYE, P. J.

/s/                   
MAURO, J.