Filed 4/8/22  P. v. Lopez-Sanchez CA4/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>ALVARO ALDAIR LOPEZ-SANCHEZ,<br><br>     Defendant and Appellant. | G059285<br><br>(Super. Ct. No. 18NF0433)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Elizabeth G. Macias, Judge.  Affirmed.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Andrew S. Mestman and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Alvaro Aldair Lopez-Sanchez of one count of second degree robbery, two counts of assault with a deadly weapon, and found true that he personally used a firearm in the commission of the crimes. The court sentenced defendant to five years in prison.

Defendant argues his conviction must be reversed because the trial court refused to permit a defense witness to restate or clarify portions of her testimony after the trial court concluded the witness had been coached by defense counsel during a recess. We conclude the trial court acted within its discretion and affirm.

FACTS

Two high school students, J.S. and N.C., were on their way home from basketball practice on the evening of December 4, 2017, when they were approached by two men. J.S. was walking his bicycle. One of the men who approached the students asked them to give the bicycle to his companion. When J.S. said no, the man pulled a gun out of his pocket and asked for the bicycle again. This time, J.S. handed over the bicycle. The students began to walk away, but the man with the gun told them to run. They did. When they reached a traffic light, J.S. called the police.

On his call to the police (an audio recording of which was later admitted at trial as an excited utterance), J.S. described the man with the gun as Hispanic, approximately 19 to 20 years old, around five feet five inches tall, "chubby," and wearing a black sweater and jeans. He described the gun as a black handgun, possibly with a silencer. J.S. described the man without the gun as wearing a black sweater, black pants, and a black bandana. J.S. also provided a description of his bicycle.

Later that night, the police detained S.M., whom they observed in possession of a bicycle matching J.S.'s description. The police brought the students to the scene. The students identified the bicycle but could not identify S.M. as one of the men who robbed them. The students both testified they did not get a clear look at the

2

faces of the men who robbed them. About a month later, when shown a photographic lineup, neither J.S. nor N.C. was able to identify anyone.

S.M.'s then-girlfriend C.E. testified that on December 4, 2017, she was at S.M.'s house when defendant offered her and S.M. a ride. Defendant is S.M.'s stepmother's brother. Defendant had a gun with him. C.E. and S.M. got in defendant's car (a black four door with a dent on the driver's side door) and eventually stopped near a high school.

C.E. saw defendant and S.M. get out of the car and approach two males, who had a bicycle with them. She saw defendant say something but could not hear anything. She saw the gun pointed toward one of them, after which the two males began to walk away, and then to run. Defendant got back in the car, while S.M. left with the bicycle. Defendant took C.E. home and told her "to not speak on his name." C.E. understood this to mean that she should not say anything to anyone. Defendant also threatened to hurt C.E.'s family.

A few days later, C.E. went to the police about the December 4, 2017 incident. A portion of an audio recording of C.E. 's interview was played for the jury. In the recording, C.E. described the gun as a double-barreled sawed-off shotgun. C.E. also said defendant threatened S.M. with the gun and told him they would steal the bicycle together. C.E. told police that defendant had a large tattoo of the word "Norwalk" on the back of his neck. Defendant showed the jury he had no such tattoo.

On February 13, 2018, defendant was arrested while driving his car (a black four door with a dent between the driver and passenger door on the driver's side). A search of the car yielded two expended shotgun cartridges, a box of unexpended cartridges, and a sawed-off shotgun barrel. The arresting officer testified the shotgun barrel did not "appear to" come from a double barrel shotgun.

The defense called four witnesses: Dulce G. (defendant's sister and S.M.'s stepmother), Alfredo M. (S.M.'s father), defendant himself, and defendant's other sister,

3

M.G. Dulce G. testified that on Friday, December 1, 2017, she, S.M., C.E., and Alfredo M. were at her home. At some point during that day, defendant left to buy work shoes for his girlfriend. Dulce G. testified S.M. and C.E. both left her house at some point that day as well, but that she did not know whether they left with defendant.

At this point in Dulce G.'s testimony, the court declared a recess. Defense counsel suggested to the court that he might need an interpreter for Dulce G. After discussion with Dulce G. during the recess, defense counsel told the court that Dulce G. had been "just somewhat thrown off or confused" and did not need an interpreter. Dulce G. then testified that on Monday, December 4, 2017, defendant was not present at her home, but S.M. and C.E. were present until 5:30 p.m.

Defense counsel now returned to Friday, December 1, 2017, asking Dulce G. whether S.M. and C.E. left with defendant to go anywhere on that date. The prosecutor objected that this question had been asked and answered. The trial court sustained the objection. Defense counsel asked Dulce G. whether she had been confused previously, and Dulce G. indicated she had. The court held a sidebar conference and excused the jury.

After the jury was excused, the trial court, the prosecutor, and defense counsel questioned Dulce G. about her conversation with defense counsel during the recess. Dulce G. testified defense counsel did not share any information with her about her testimony. However, she also testified that defense counsel reminded her she previously told him about December 1, 2017. The trial court concluded this constituted coaching the witness and barred defense counsel, over his objection, from asking any further questions about defendant's presence on December 1, 2017.

Alfredo M. testified he brought S.M. home from school on December 4, 2017, but left for work around 3:30 p.m. He also testified defendant was at his home on December 1, 2017; but did not come to his house on December 4, 2017.

Defendant testified he worked on December 1, 2017, from 7:30 a.m. to 4:30 p.m. Defendant owned a new, black, four door Honda Civic. Defendant went to his sister, Dulce G.'s house at around 5:45 p.m. on December 1, 2017. Defendant met C.E. for the first time on December 1, 2017. Shortly after 6:00 p.m. that day, S.M. and C.E. left. Defendant had planned to take his sister, Dulce G., to buy work shoes, for her and his girlfriend. When Dulce G. arrived, however, she told defendant she was tired and declined to go buy shoes.

Defendant left Dulce G.'s house to buy the shoes for his girlfriend. As defendant was driving away, he saw S.M. and C.E. Defendant asked them for directions to the nearest Walmart or Target store. S.M. and C.E. got in defendant's car to give him directions, and defendant offered to drive them home once he finished his errand. The three went to Walmart, where defendant bought shoes for his girlfriend. Defendant, along with C.E. and S.M., drove to defendant's girlfriend's work to deliver the shoes. Defendant testified he had no gun with him and had never owned nor held a gun. Defendant then dropped S.M. and C.E. off at C.E. 's house at around 8:00 p.m.

On December 4, 2017, defendant worked from 5:00 a.m. to 2:30 p.m. Defendant was wearing a company-issued orange shirt. Defendant left work and drove to his home in south central Los Angeles. He changed his clothes and took his girlfriend to work. Defendant then drove to Bellflower to meet his parents for dinner. He arrived a few minutes past 6:00 p.m., and he and his parents ate dinner until approximately 7:15 p.m. Defendant intended to drive back to his house, but instead drove his sister, M.G., to his parents' house in Norwalk, where he stayed that night.

Defendant testified the shotgun shells found in his car were given to him by a client on a prior demolition job. Defendant showed the jury he had no tattoo on his neck.

5

The final defense witness, M.G., testified she went to dinner on December 4, 2017, with her parents and defendant.  After dinner, defendant took her home to her parents' house, where defendant went to bed.

At the conclusion of the trial, the jury convicted defendant of second degree robbery and two counts of assault with a firearm (one each for J.S. and N.C.).  The jury also found defendant used a firearm in connection with each of these offenses.  Defendant was sentenced to five years in prison.  Defendant timely appealed.

DISCUSSION

Defendant argues his due process rights were violated by the trial court's refusal to allow Dulce G. to change her answer, and by the trial court's questioning of Dulce G. in reaching that determination.  In support of this contention, defendant relies on *U.S. v. Arthur* (6th Cir. 1991) 949 F.2d 211 (*Arthur*) for the proposition that the trial court's "badgering" of Dulce G. and refusal to allow her to change her testimony violated defendant's constitutional right to present a defense.

In *Arthur*, the defendants (Terry and Danny Arthur, two brothers)[1] were accused of robbing a bank in Tennessee.  (*Arthur*, *supra*, 949 F.2d at pp. 212-213.)  Terry admitted committing the robbery, as did an uncharged coconspirator, Larry Fields.  (*Id.* at p. 213.)  Both, however, denied that Danny was involved.  (*Ibid.*)  At trial, Fields took the stand and testified he met Terry and they were looking for a bank to rob.  (*Id.* at p. 214.)  Before Fields could testify as to the details of the robbery itself, the prosecutor asked the district court to inform Fields of his Fifth Amendment right to remain silent.  (*Ibid*.)  The district court then "entered into a long colloquy with [Fields] outside the presence of the jury," in which it "strongly encouraged [Fields] to assert the fifth amendment."  (*Ibid.*)  After Fields initially indicated he still wanted to testify to clear Danny, the district court

[1] Because the brothers share a last name, their first names are used for convenience and ease of reference.

6

stated, "'I think it's not to your best interest to testify because anything you say may be held against you in another prosecution against you for bank robbery, could and would be used against you.'" (*Ibid.*) Fields then asserted his Fifth Amendment rights. (*Ibid.*) The district court refused to allow any further questioning of Fields, including on matters about which he had already testified, and refused Danny's attempt to introduce Fields's earlier confession to the Federal Bureau of Investigation as a statement against interest. (*Id.* at pp. 214-215.)

The Sixth Circuit concluded the district court abused its discretion, noting that such an abuse occurs "when the district court actively encourages a witness not to testify or badgers a witness into remaining silent." (*Arthur*, *supra*, 949 F.2d at pp. 215-216.) Citing *Webb v. Texas* (1972) 409 U.S. 95, the Sixth Circuit held this abuse of discretion violated Danny's right to due process. (*Arthur*, at p. 216.)

Defendant argues the trial court's questioning of Dulce G. and refusal to permit her to change her testimony amount to the same type of due process violation as the district court's behavior in *Arthur*. We disagree. The court's questioning of Dulce G. was probing but was not badgering. The court noted Dulce G.'s nervousness was "perfectly understandable," and the prosecutor, while questioning Dulce G., noted she was "not in any trouble," and that she was "not trying to make [Dulce G.] feel bad."

The trial court had an understandable concern that the trial recess had allowed Dulce G. to be coached, and its questions were appropriately aimed at determining whether that had happened. Further, the trial court's ultimate ruling was consistent with a similar approach taken in *People v. Alcala* (1992) 4 Cal.4th 742, 794-795, in which the trial court refused to permit defense counsel to ask a witness the same question again, after the witness had already indicated she did not recall the same answer. Our Supreme Court found no error in this approach; nor do we. Moreover, as the Attorney General points out, "excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge*

7

(1994) 7 Cal.4th 1075, 1103.)  The precise sequence of defendant, S.M., and C.E.'s exit from Dulce G.'s house three days before the robbery is indisputably a "minor or subsidiary point," and one upon which, in any event, defendant himself testified.

The trial court chose a Draconian remedy; it could just as easily have allowed the prosecution to cross-examine the witness about the fact she had talked to defense counsel and then changed her testimony, but it chose instead to preclude that change entirely.  The law rarely affords such remedies against criminal defense, and we scrutinize them closely.  We have concluded this one passes muster.

## DISPOSITION

The judgment is affirmed.

SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

8